No. 24-13393

# In the United States Court of Appeals
# for the Eleventh Circuit

THE OKAVAGE GROUP, LLC,

*Plaintiff - Appellant,*

v.

UNITED WHOLESALE MORTGAGE, LLC, MATHEW ISHBIA,

*Defendants - Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 3:21-cv-00448
Hon. Wendy W. Berger

## APPELLANT'S BRIEF

Robert H. Goodman
PARRISH & GOODMAN, PLLC
Florida Bar No.: 1008059
13031 McGregor Blvd., Suite 8
Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
rgoodman@parrishgoodman.com

*Attorney for Plaintiff - Appellant*
THE OKAVAGE GROUP, LLC

**ORAL ARGUMENT REQUESTED**

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT (CIP)

The Okavage Group, LLC _vs._ United Wholesale Mortgage, LLC, et al. Appeal No. **24-13393**

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed.  Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court.  **You may use this form to fulfill these requirements.**  In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

_(please type or print legibly)_:

District Judge Wendy Berger

Glenn Goldstein, Esq.

Greenberg Traurig, P.A.

Joseph E. Parrish, Esq.

Magistrate Judge Laura Lothman Lambert

Mat Ishbia

Parrish & Goodman, PLLC

Robert H. Goodman, Esq.

Sabrina D. Niewialkouski

The Okavage Group, LLC

The Okavage Group, LLC v. United Wholesale Mortgage, LLC, et al.

Appeal No.: 24-13393

United Wholesale Mortgage, LLC

UWM Holdings Corporation (UWMC)

## Statement Regarding Oral Argument

Class Action Plaintiff The Okavage Group, LLC ("Okavage") respectfully submits that an oral argument is not required to adequately present the legal arguments in the briefs and the record.

Dated: December 27, 2024                    By:  /s/ Robert Goodman

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ................................................... i

TABLE OF CONTENTS ....................................................................................... ii

TABLE OF CITATIONS ...................................................................................... iv

APPELLANT'S BRIEF ......................................................................................... 1

    STATEMENT REGARDING SUBJECT-MATTER AND
    APPELLATE JURISDICTION ...................................................................... 1

    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................... 2

    I.   STATEMENT OF THE CASE ................................................................ 4

      A.  Factual Background .......................................................................... 4

        1.  The Wholesale Mortgage Lending Market ................................ 4

        2.  Competition Among Mortgage Brokers and Lenders ................ 6

        3.  UWM Provides Lower Quality and Higher Price than Its
            Largest Competitors ................................................................. 6

        4.  The Competitive Threats Faced By UWM ................................ 7

        5.  The Boycott ............................................................................. 8

        6.  Effect of the Boycott ............................................................... 11

        7.  The Boycotters' and UWM's Market Dominance ..................... 12

        8.  Barriers to Entry ...................................................................... 13

        9.  Anticompetitive Effects ........................................................... 13

        10.  Okavage ................................................................................. 14

      B.  Procedural History .......................................................................... 14

        1.  The Magistrate Judge's Report and Recommendation ............. 14

        2.  Okavage's Objections to the Report ......................................... 17

        3.  The District Court's Order ........................................................ 17

    II.   SUMMARY OF THE ARGUMENT ...................................................... 19

    III.  STANDARD OF REVIEW ................................................................... 20

      A.  Standard Applicable to Motions to Dismiss .................................... 20

B.   The Twombly Standard in Antitrust Cases............................................ 21

IV.   ARGUMENT .................................................................................... 23

A.   The District Court Erred in Rejecting Detailed Allegations of
a Relevant Submarket.................................................................... 23

B.   The District Court Erred in Rejecting Well-Pleaded
Allegations Supporting Okavage's *Per se* Antitrust Claim.................. 28

1.   Okavage Plausibly Alleged a Horizontal Agreement ....................... 28

a.   The SAC Adequately Pleaded the Existence of an
Agreement Among Brokers. ................................................... 28

b.   In the Alternative, the SAC Adequately Pleaded the
Existence of Invitations to Collude. ........................................ 31

c.   Group Boycotts May Be Proven by Parallel Conduct
and Plus Factors Suggesting Agreement.................................... 32

d.   The District Court's Other Errors............................................ 36

2.   Okavage Plausibly Alleged Market Dominance............................... 38

3.   The SAC Plausibly Alleges that the Boycott Cut Off
Necessary Suppliers ............................................................... 42

C.   The District Court Erred in Rejecting Well-Pleaded
Allegations Supporting Okavage's Rule-of-Reason Antitrust Claim ... 43

1.   The District Court Failed to Consider Well-Pleaded
Allegations of Actual Anticompetitive Effects.................................. 43

2.   The District Court Erred in Rejecting the SAC's Allegations
of UWM's Market Power.......................................................... 46

D.   The District Court Erred in Rejecting Well-Pleaded
Allegations Supporting Okavage's Attempted Monopolization Claim. 48

E.   Okavage's Remaining Claims ............................................................ 51

V.   CONCLUSION.................................................................................. 52

CERTIFICATE OF COMPLIANCE ........................................................ 53

CERTIFICATE OF SERVICE ................................................................. 54

## Table of Citations

Page

**Cases:**

*Advanced Cartridge Tech., LLC v. Lexmark Int'l, Inc.*
2011 WL 6719725 (M.D. Fla. Dec. 21, 2011) ................................ 52

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
486 U.S. 492 (1988) ...................................................................... 33

*Anderson News, L.L.C. v. Am. Media, Inc.*
680 F.3d 162 (2d Cir. 2012) .......................................................... 31

*Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*
786 F.2d 564 (3d Cir. 1986) .......................................................... 35

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ................................................................ 20, 30

*Aspen Skiing v. Aspen Highlands Skiing Corp.*
472 U.S. 585 (1985) ................................................................ 45, 46

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*
953 F.3d 707 (11th Cir. 2020) ....................................................... 32

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ........................................... 2, 19, 21, 22, 23, 38

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*
974 F.2d 1358 (3d Cir. 1992) ........................................................ 35

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*
203 F.3d 1028 (8th Cir. 2000) ....................................................... 33

*Brown Shoe Co. v. U.S.*
370 U.S. 294 (1962) ............................................................ 23, 24, 27

*California Dental Ass'n v. Fed. Trade Comm'n*
526 U.S. 756 (1999) ...................................................................... 33

*California Dental Ass'n v. FTC*
128 F.3d 720 (9th Cir. 1997) ......................................................... 33

*Chaparro v. Carnival Corp.*
693 F.3d 1333 (11th Cir. 2012) ..................................................... 20

*Cox v. Adm'r U.S. Steel & Carnegie*
  17 F.3d 1386 (7th Cir. 1994) ..................................................... 20, 21

*DeLong Equip. Co. v. Wash. Mills Abrasive Co.*
  887 F.2d 1499 (11th Cir. 1989) ................................................. 22

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*
  732 F.2d 480 (5th Cir. 1984) .................................................... 49

*E.I. du Pont de Nemours v. Kolon Indus.*
  637 F.3d 435 (4th Cir. 2011) .................................................... 27

*Eastman Kodak*
  504 U.S. 451 (1992) ............................................................... 45

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*
  24 F.4th 1262 (9th Cir. 2022) ................................................... 46

*Evergreen Partnering Grp., Inc. v. Proactiv Corp.*
  720 F.3d 33 (1st Cir. 2013) ..................................................... 21, 22

*Flinkote Co. v. Lysfjord*
  246 F.2d 368 (9th Cir. 1957) .................................................... 37

*Fortner Enters., Inc. v. U.S. Steel Corp.*
  394 U.S. 495 (1969) ............................................................... 39

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*
  244 F.3d 521 (6th Cir. 2001) .................................................... 27

*FTC v. Indiana Fed'n of Dentists*
  476 U.S. 447 (1986) ........................................................ 28, 43, 44

*FTC v. Staples, Inc. (Staples II)*
  190 F. Supp. 3d 100 (D.D.C. 2016) ........................................... 24, 25

*FTC v. Staples (Staples I)*
  970 F. Supp. 1066 (D.D.C. 1997) ............................................. 24, 25

*FTC v. Sysco Corp.*
  113 F. Supp. 3d 1 (D.D.C. 2015) .............................................. 24, 25

*Gen. Inds. Corp. v. Hartz Mountain Corp.*
  810 F.2d 795 (8th Cir. 1987) .................................................... 51

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
  125 F.3d 1195 (9th Cir. 1997) ................................................. 40, 41

*In re Delta/Airtran Baggage Fee Antitrust Litig.*
   245 F. Supp. 3d 1343 (N.D. Ga. 2017)  ....................................................... 31

*In re High Fructose Corn Syrup Antitrust Litig.*
   295 F.3d 651 (7th Cir. 2002)  .................................................................... 36

*In Re Ins. Brokerage Antitrust Litig.*
   618 F.3d 300 (3rd Cir. 2010)  .................................................................... 30

*In re Plywood Antitrust Litig.*
   655 F.2d 627 (5th Cir. 1981)  .................................................................... 33

*In re Salmon*
   2021 WL 1109128 (S.D. Fla. Mar. 23, 2021)  .............................................. 33

*In re Text Messaging Antitrust Litig.*
   630 F.3d 622 (7th Cir. 2010)  .................................................................... 22

*Jackson v. Wal-Mart Stores, Inc.*
   753 F. App'x 866 (11th Cir. 2018)  ............................................................. 23

*Jacobs v. Tempur-Pedic Intern., Inc.*
   626 F.3d 1327 (11th Cir. 2010)  ................................................................. 20

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*
   190 F.3d 775 (7th Cir. 1999)  .................................................................... 52

*Kelco Disposal, Inc. v. Browning-Ferris Inds. of Vermont, Inc.*
   845 F.2d 404 (2d Cir. 1988)  ..................................................................... 51

*La Grasta v. First Union Sec., Inc.*
   358 F.3d 840 (11th Cir. 2004)  .................................................................. 20

*Love v. Weeco (TM)*
   774 F. App'x 519 (11th Cir. 2019)  ............................................................. 20

*McGahee v. N. Propane Gas Co.*
   858 F.2d 1487 (11th Cir. 1988)  ................................................................ 40

*McWane, Inc. v. FTC*
   783 F.3d 814 (11th Cir. 2015)  .................................................................. 25

*MM Steel L.P. v. JSW Steel (USA) Inc.*
   806 F.3d 835 (5th Cir. 2015)  .................................................................... 36

*Monsanto Co. v. Spray-Rite Serv. Corp.*
   465 U.S. 752 (1984)  ........................................................................ 21, 29

*N. Pac. Ry. Co. v. U.S.*
  356 U.S. 1 (1958) ............................................................ 39

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*
  472 U.S. 284 (1985) ........................................... 38, 39, 42

*O'Brien v. Colvin*
  2014 WL 4632222 (E.D. Pa. Sept. 16, 2014) ................ 46

*Ohio v. Am. Express Co.*
  138 S. Ct. 2274 (2018) .................................................. 43

*Particular Presents, Inc. v. Clear Channel Comm's, Inc.*
  311 F. Supp. 2d 1048 (D. Colo. 2004) ........................... 49

*Quality Auto. Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*
  917 F.3d 1249 (11th Cir. 2019) ...................................... 32

*Realcomp II, Ltd. v. F.T.C.*
  635 F.3d 815 (6th Cir. 2011) .................................... 44, 45

*Restore Robotics LLC v. Intuitive Surgical, Inc.*
  2022 WL 19408080 (N.D. Fla. Feb. 7, 2022) ................ 48

*Scheuer v. Rhodes*
  416 U.S. 232 (1974) ...................................................... 21

*Siegel v. Delta Air Lines, Inc.*
  714 F. App'x 986 (11th Cir. 2018) ................................. 31

*Silver v. New York Stock Exch.*
  373 U.S. 341 (1963) ...................................................... 42

*Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control
& Prevention*
  623 F.3d 1371 (11th Cir. 2010) ...................................... 40

*Spirit Airlines, Inc. v. Nw. Airlines*
  431 F.3d 917 (6th Cir. 2005) .......................................... 25

*T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc.*
  931 F.2d 816 (11th Cir. 1991) ........................................ 26

*Tops Mkts., Inc. v. Quality Mkts., Inc.*
  142 F.3d 90 (2d Cir. 1998) ............................................. 51

*Toys "R" Us, Inc. v. FTC*
  221 F.3d 928 (7th Cir. 2000) .......................................... 41

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*
  7 F.3d 986 (11th Cir. 1993) ....................................................... 23, 49

*U.S. v. Andreas*
  216 F.3d 645 (7th Cir. 2000) ............................................... 32

*U.S. v. Apple, Inc.*
  791 F.3d 290 (2d Cir. 2015) ............................................... 36

*U.S. v. Beaver*
  515 F.3d 730 (7th Cir. 2008) ............................................... 32

*U.S. v. Dentsply Int'l, Inc.*
  399 F.3d 181 (3d Cir. 2005) ........................................... 45, 47

*U.S. v. H&R Block, Inc.*
  833 F. Supp. 2d 36 (D.D.C. 2011) .............................. 24, 25, 26, 43

*Virgin Atl. Airways, Ltd. v. Brit. Airways PLC*
  257 F.3d 256 (2d Cir. 2001) ............................................... 43

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*
  648 F.3d 452 (6th Cir. 2011) ........................................... 21, 35

**Court Rules:**

Fed. R. Civ. P. 12 ........................................................ 20

**Other:**

*All for one and one for all*, Dictionary.com ........................... 29

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization*
  92 (3d ed. 2005) ........................................................ 48

Edward A. Hartnett, *Taming Twombly, Even After Iqbal*, 158 U. Pa. L.
  Rev. 473, 491 (2010) ............................................... 23, 26

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶807d2 ...... 38

**Appellant's Brief**

## STATEMENT REGARDING SUBJECT-MATTER AND APPELLATE JURISDICTION

This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. §1291, as it arises from a final judgment of the United States District Court for the Middle District of Florida within the Eleventh Circuit, concerning claims brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This court has direct federal question jurisdiction pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15(a), and 28 U.S.C §1331, and pendant and supplemental jurisdiction over all related claims pursuant to 28 U.S.C. §1337.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether, in dismissing The Okavage Group, LLC's ("Okavage") Supplemental Class Action Complaint (ECF No. 96) ("SAC"), the District Court committed reversible error by failing to credit Okavage's well-pleaded factual allegations supporting the existence of an antitrust conspiracy between United Wholesale Mortgage, LLC ("UWM") and mortgage brokers to eliminate competition in the relevant market.

2. Whether the District Court erred in rejecting plausible inferences, weighing evidence, and mischaracterizing numerous specific allegations as conclusory in contravention of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), which held that a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss.

3. Whether the District Court erred in dismissing Okavage's *per se* claim.

4. Whether the District Court committed reversible error when, at the pleading stage, it disregarded well-pleaded factual allegations of plus factors supporting an inference of conspiracy, including allegations demonstrating that boycotting brokers acted against their unilateral self-interest.

5. Whether under the rule of reason claim, the District Court committed reversible error when it dismissed as "conclusory" concrete allegations of harm to competition, including reduction in access to lower cost, higher quality competitors who were UWM's largest and closest rivals, interference with autonomy in the marketplace, and narrowing of consumer choice.

6. Whether the District Court committed reversible error when it disregarded detailed factual allegations supporting a relevant submarket for wholesale mortgages, despite this Court's warning that the definition of the relevant market is "essentially a factual question" reserved for discovery.

7. Whether the District Court committed reversible error by failing to credit Okavage's well-pleaded factual allegations supporting its attempted monopolization claim.

8. Whether the District Court committed reversible error when, at the pleading stage, it disregarded allegations and evidence of UWM's rapidly increased (54%) market share and other specific allegations supporting the conclusion that UWM possessed market power.

9. Whether due to the foregoing errors, the District Court erred in dismissing Okavage's declaratory judgment, Florida Antitrust Act, and Florida Deceptive and Unfair Trade Practices Act claims and its allegations of Mathew Ishbia's personal liability.

10. Whether the District Court erred in concluding that it lacked personal jurisdiction over Matthew Ishbia where Ishbia committed statutory torts, including state and federal antitrust violations, that caused injury inside the state.

## I.  STATEMENT OF THE CASE

### A.  Factual Background

The following summarizes the most significant facts alleged in the Supplemental Class Action Complaint ("SAC").

### 1.  The Wholesale Mortgage Lending Market

Wholesale mortgage lending is a relevant antitrust market or sub-market. Doc. 96 at 1236, SAC ¶20. In this market, lenders do not deal directly with consumers but compete for the referrals of mortgage brokers. *Id.* ¶24. In contrast, retail lenders market directly to the consumer. *Id.* ¶21.

In the wholesale market, mortgage brokers advise the customer of available loan terms and select a particular wholesale mortgage lender to find the best mortgage loan product and pricing for their clients. *Id.* ¶22. Wholesale mortgage brokers also provide prospective borrowers with loan applications, perform income verification and collect other required documentation. *Id.* The central pillar of the mortgage broker business is independence: the ability of each individual broker to choose from a variety of wholesale lenders to select the mortgage product that best matches the needs of the broker's client. *Id.*

The broker's value rests in his or her knowledge of mortgage options that lenders offer. *Id.* ¶23. Therefore, a broker can often find mortgage options that are less expensive, but still meet each buyer's preferences. *Id.*

The national wholesale lending market thus involves a distinct group of consumers (those who choose to work with mortgage brokers), and a specialized class of vendors (mortgage brokers) with their own unique facilities in local communities. *Id.* ¶¶25(A), (C). The wholesale lending market is widely recognized as a distinct market by mortgage brokers and the mortgage industry. *Id.* ¶25(B). Unlike in the retail channel, wholesale mortgage lenders do not operate facilities for marketing directly to consumers. *Id.* ¶25(D). Consumers who utilize mortgage brokers (and therefore wholesale mortgage lenders) would not readily switch to a retail mortgage lender for a small difference in price, because of their desire to obtain advice from a mortgage broker professional regarding the proper choice of a mortgage. *Id.* ¶25(E).

UWM maintains that the typical borrower who uses a mortgage broker will save $9,400 over the life of the loan, compared to a borrower who uses a standard retail lender. *Id.* ¶25(F). UWM's annual report describes numerous benefits offered solely at wholesale, including among other things, brokers able to "leverag[e] their deep knowledge base of complex financial products to help borrowers make informed decisions," "flexibility of matching their borrowers' needs with the most applicable lender and lender program," "enhance[d] efficiency," alignment of broker and borrower interests, and provision of "Superior Sophisticated and Personalized Service." Doc. 102 at 1369–70.[1]

---

[1]    UWM's Form 10-K (March 1, 2023) (containing this statement) is specifically referred to in ¶101 of the SAC, and was subsequently attached to UWM's motion to dismiss. *See* Dkt. 102 at 4. Additionally, the Magistrate Judge specifically relied on these documents for the Report. *See* Dkt. 112 at 33, 41-42.

### 2.    Competition Among Mortgage Brokers and Lenders

Mortgage brokers compete with one another for the business of consumers seeking mortgages. *Id.* ¶24. All mortgage brokers thus operate at the same market level. *Id.*

More than 10,000 mortgage brokers utilize UWM. *Id.* ¶27. As of the fourth quarter of 2022, the most recent period cited in the SAC, UWM—the largest wholesale mortgage lender in the United States—had an approximate 54% share of the wholesale mortgage lending market. *Id.* ¶104. This marked a substantial increase from UWM's 34% market share in the year prior to UWM's actions challenged in the SAC. *Id.*

UWM's 2021 prospectus notes that "the mortgage business has experienced substantial consolidation." *Id.* ¶28. Commentators have predicted a "shakeout" of smaller mortgage lenders, leading to further gains in market share by larger firms like UWM. *Id.* 63. A 2023 report indicates that at least 17 firms have exited the wholesale market since the filing of the Second Amended Complaint. *Id.* ¶106.

### 3.    UWM Provides Lower Quality and Higher Price than Its Largest Competitors

UWM's competition for wholesale mortgage lending includes Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway"). *Id*. ¶31. These firms also compete at "retail," providing products directly to consumers. *Id.* ¶¶30–31.[2]

---

[2]    Since the date of the SAC, Fairway has exited the wholesale market. Dkt. 119, Pl.'s Mem. Supp. Mot. Leave File Sec. Suppl. Compl. ("SSC Mem.") at 1-3.

Rocket offers a number of benefits to mortgage brokers and their customers not available through UWM. *Id*. ¶32.B and C. In particular, Rocket is less restrictive in the credit scores it requires than is UWM, and therefore provides loans to many consumers who would be refused by UWM. *Id*. ¶32.B. Rocket also offers lower cost mortgage insurance than UWM and is rated more highly by many firms that evaluate mortgage lenders. *Id*. ¶32.C. For example, Rocket outranked UWM (and was second among all mortgage lenders) in the J. D. Powers 2022 Mortgage Servicers Satisfaction survey. *Id.* Bankrate scored both Rocket and Fairway higher than UWM in all three scoring components: affordability, availability, and borrower experience. *Id.* Fairway was identified as the best mortgage lender for USDA loans by the Ascent. *Id.* ¶33.A.

Both UWM and numerous brokers have concluded that UWM was higher priced than its major competitors. Mr. Ishbia, UWM's CEO, has stated that UWM is "not trying to be the best priced." *Id*. ¶34. One broker has stated that Rocket "consistently beat[s] UWM in price across every product type offered." *Id*. Another broker stated that UWM's "pricing is often higher than their competitors . . ." *Id*. In one illustrative case, Rocket's rate was less than 15% of UWM's rate. *Id*. ¶78.

### 4.  The Competitive Threats Faced By UWM

As of early 2021, UWM's leading position in the wholesale market was threatened by Fairway and Rocket. *See id*. ¶35. Prior to January 2021, UWM's share price had been declining, while its competitors in the wholesale lending market, including Rocket and Fairway, were expanding their market share, in part because of their

innovative product offerings and better pricing. *Id.* From 2018 to 2021 the number of mortgage brokers utilizing Rocket increased from 3,000 to 10,000, reflecting the fact that Rocket's products and prices were especially attractive. *Id.* In fact, in the month prior to the Ultimatum, Rocket originated as many wholesale mortgage loans as UWM. *Id.*

### 5. The Boycott

In response, Mr. Ishbia announced UWM's "Ultimatum" at a live virtual meeting with brokers on UWM's Facebook page. *Id.* ¶36. UWM introduced an addendum to its broker agreements that included a requirement that the signatory not submit loans to either Rocket or Fairway. The addendum provided that any breach would result in substantial financial penalties. *Id.* ¶54. Mr. Ishbia said specifically that "[i]f you work with them [Rocket or Fairway], you can't work with UWM anymore." *Id.* ¶36.

Mr. Ishbia's statements and UWM's brokers' communications in response to Mr. Ishbia took place in public view on an interactive Facebook site accessible to thousands of brokers. *Id.* ¶42. Mr. Ishbia referred to his plan as the "'all in' initiative." *Id.*

During this virtual meeting, brokers made numerous statements in support of the boycott of Rocket and Fairway. These statements referred to collective action by the brokers:

- "We are ALL IN"

- "unstoppable together ..."

- "We are all family! Brokers are better when we work together"

- "Brokers are family. We don't go against our family"

- "All in … with us or out"

- "You're either with the captain [UWM] or off the boat"

- "with us or against us"

- "all for one and one for all"

- "Team Broker!"

- "Let's kill it fam—you know it's going to be good"

- "BROKERS---WAKE UP!!! Stop sending files to the enemy! Protect your book of business"

- "This is what we have been waiting for broker community"

- "Sign on the line that is dotted."

*Id.* ¶41. Mr. Ishbia stated that "all of our current clients are aligned" with respect to this initiative and that the participating brokers "have locked arms with us." *Id.*

Brokers also used the live event to discourage other brokers who disagreed with the boycott and to encourage agreement. *Id.* For example, when Broker C joined the discussion to express his opposition to the boycott, Broker A castigated him and accused him of not "car[ing] about the [broker] channel as a whole." *Id.* ¶43. Broker

9

A also encouraged others to engage with Rocket "no more! Sign the addendum." *Id.* ¶49. When Broker B confirmed that she had signed, Broker A replied, "great job!" *Id.*

UWM provided forums for mortgage brokers to work together to terminate Rocket and Fairway. *Id.* ¶50. Broker E asked, "Where do we get the form to sign[?]." He received a response from another broker with instructions on how to access the addendum and terminate his broker agreement with Rocket. *Id*. ¶44.

On the same day as the live virtual meeting, the Association of Independent Mortgage Experts ("AIME") issued a letter voicing support for the boycott. *Id*. ¶45. AIME describes itself as "a community" of "mortgage professionals." *Id*. ¶46, and states that its members "come from every region across the country." *Id*. ¶45. As part of the live chat, AIME supported the boycott and stated: "Work with TRUE lender partners." *Id*. Other trade groups acted similarly. *Id*. ¶48. AIME receives significant funding from UWM. *Id.* ¶45.

The boycott was a dramatic change in behavior by thousands of brokers, who until that time had been utilizing Rocket and Fairway in substantially increasing numbers because of Rocket's and Fairway's strong reputation, lower prices and high quality. *Id*. ¶¶35, 65. Thus, the decision to boycott Rocket and Fairway was contrary to the brokers' unilateral self-interest, as reflected in their prior unilateral decisions. *Id*. ¶65.

The decision to boycott would have been even more contrary to the interests of the brokers if they had not agreed to the boycott in overwhelming numbers. *Id.* If an individual broker deprived itself of the availability of loans from Fairway and Rock-

et, it risked losing substantial business to other brokers who offered these alternatives. But once thousands of brokers agreed to forego Rocket and Fairway, this risk was substantially reduced. This is reflected in the comments of brokers, discussed above, that they were "unstoppable together." This provided a strong motivation for them to act collectively. *Id*. ¶¶41, 65–66.

### 6.  Effect of the Boycott

Mr. Ishbia predicted during the virtual meeting that Rocket and Fairway would lose 70%-90% of their business as a result of the boycott. *Id*. ¶61. Mr. Ishbia later indicated that the boycott exceeded his expectations, stating "I couldn't have imagined it going so well." *Id.* UWM announced that "93% of the brokers presented with the addendum agreed to join." *Id.* Since UWM's brokers represent significantly more than 60% of the wholesale mortgage brokers in the United States, *id.* ¶27, simple arithmetic indicates that more than 55% of all wholesale brokers (93% of 60%) joined the boycott.

The success of the boycott was borne out by UWM's dramatic increase in market share from 34% before the boycott to 54% after it. *Id.* ¶104. Mr. Ishbia directly linked this increase to the boycott: "When we announced the [Ultimatum], they [Rocket] were more than twice my size overall, not wholesale, overall. Now I'm bigger than them." *Id.* ¶105.

### 7.  The Boycotters' and UWM's Market Dominance

UWM has substantial market power, reflected in its market share and its ability to successfully impose burdensome terms on its brokers. 93% of UWM's brokers agreed to the Ultimatum, even though that deprived them of access to lower priced, high-quality lenders that they had previously been using in increasing numbers. *Id.* ¶¶35, 65, 82. In a February 2023 interview, Mr. Ishbia explained that the boycott was so successful because "[t]he penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance." *Id.* ¶103.A. Mr. Ishbia explained that "[o]nce you have brokers that don't work [with] UWM, they lose out. That's why of the 12,000 brokers, 11,500 all stayed with UWM." *Id.* ¶103.B. UWM's ability to force this result demonstrates its power in the market.

Mr. Ishbia repeatedly boasted of UWM's substantial market power. In UWM's March 2023 earnings call, Mr. Ishbia claimed UWM "control[s] the margins in this industry"—an indication that UWM has sufficient market power to dictate prices in the market. *Id.* ¶109. Mr. Ishbia repeatedly referred to UWM in interviews in February and March, 2023 as "dominant" and "dominat[ing]" the wholesale markets. *Id.* ¶102.

UWM's market strength has been enhanced by the continued exit of many competitors from the market. *Id.* ¶106. The competitors who exited include significant firms like loanDepot and Wells Fargo, which was once the market leader. *Id.*

### 8.   Barriers to Entry

There are substantial barriers to successful entry into wholesale mortgage lending, including the need to develop (a) a sophisticated electronic platform that can take years to complete and cost millions of dollars, (b) hundreds, if not thousands, of qualified personnel, including a significant training program to develop personnel with the requisite skills, (c) a substantial sales force and a significant reputation, and (d) satisfaction of licensing requirements on a state by state basis, as well as compliance with federal guidelines. *Id*. ¶¶82–84. According to Mr. Ishbia, UWM enjoys significant advantages over many remaining firms because of UWM's "scale." *Id.* ¶¶63, 107. UWM stated in its March 1, 2023 annual report that: "[o]ur volume allows for significant investment in automating each step of the residential loan process, which in turn reduces error rates, improves customer service and enhances efficiency." Smaller wholesale lenders do not have the volumes to obtain these advantages. *Id.* ¶108.

### 9.   Anticompetitive Effects

The boycott harmed consumers by reducing their access to Fairway's and Rocket's lower priced, higher quality products. *Id.* ¶¶32–35, 73. Customers of terminated brokers like Okavage were also harmed by the boycott, because they did not have the opportunity to consider a UWM mortgage. *Id.* The boycott effectively insulated UWM from the need to compete with Rocket or Fairway's wholesale products on price or quality. *Id.* ¶¶31, 72, 74, 76–77.

13

The boycott also prevented brokers from performing their essential function of providing their customers with the most suitable and lowest priced loans. *Id.* ¶72. The fundamental value of independent mortgage brokers is their "flexibility to shop rates from multiple lenders." *Id.* ¶¶75–76, 80. That "flexibility" was seriously disrupted by the boycott. *Id.* ¶77.

### 10.  Okavage

Okavage is a mortgage broker that advises and aids its clients, actual and prospective borrowers, in applying for and obtaining residential mortgages. As with its fellow Class Members, Okavage regularly submitted loan applications on behalf of its clients to several wholesale lenders, including UWM, Fairway and Rocket, prior to the Ultimatum. *Id.* ¶68. Because Fairway and Rocket often offered lower-priced, better-suited mortgages for its clients, Okavage refused to agree to UWM's Ultimatum. *Id.* ¶69. UWM terminated its Wholesale Lending Agreement with Okavage shortly thereafter, causing Okavage to lose customers who were interested in UWM's offerings. *Id.* ¶70.

### B.  Procedural History

### 1.  The Magistrate Judge's Report and Recommendation

On April 23, 2021, Okavage filed the underlying lawsuit, claiming that the Ultimatum and the resulting group boycott of Rocket and Fairway violated federal and state antitrust laws. Dkt. 1.

14

On August 14, 2023, UWM filed a motion to dismiss the SAC, which was recommended by the Magistrate Judge, Report and Recommendation (ECF No. 112) ("Report"). The Magistrate Judge concluded that Okavage could not make out a per se antitrust violation "because there are not enough facts in the [SAC] to plausibly suggest the brokers agreed among themselves to boycott Rocket and Fairway." *Id.* at 22. According to the Report, the brokers' communications with one another during UWM's live event were only "independent expressions of enthusiasm." *Id.* at 23. The Report also concluded that the SAC did not adequately allege "plus factors" suggesting agreement. *Id.* at 25. The Magistrate Judge concluded that brokers' "dramatic change in behavior . . . who until that time had been utilizing [Rocket] and Fairway in increasing numbers" was "inadequate to establish that signing UWM's addendum was against the interest of the brokers who did so," because "it seems equally likely" that brokers preferred to continue to obtain UWM loans rather than continue working with Rocket and Fairway. *Id.*

The Report concluded that the alleged boycott lacked the characteristics necessary to warrant per se treatment, reasoning that "it is not facially apparent, nor characteristically likely, that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market." *Id.* at 27. The Report also concluded that UWM did not possess a "dominant position in the marketplace at the time of the ultimatum or after 93% of its mortgage brokers signed the addendum promising not to do business with Rocket or Fairway." *Id.* at 28, 32–33.

15

The Report found the allegations of the SAC on relevant market "conclusory" and faulted Okavage for "not discuss[ing] why a consumer using a retail lender could not obtain advice from a professional regarding the proper choice of a mortgage," such as a "real estate agent or retail lender." *Id.* at 31–32.

The Magistrate Judge also rejected the SAC's allegations regarding "barriers to entry"—another indicium of market power. *Id.* at 34. The Report concluded that although the SAC includes allegations regarding barriers to entry, it "does not address whether other retail lenders, who likely already possess resources needed, would be unable to enter the wholesale market." *Id.*

With respect to Okavage's rule-of-reason claim, the Report concluded that the SAC failed to adequately allege actual harm to competition. *Id.* at 40. The Report concluded that Okavage had failed to allege that "the ultimatum has increased the cost of mortgage loans" for consumers. *Id.* at 37. The Report also noted that the SAC failed to allege that either Rocket or Fairway were eliminated from the wholesale mortgage market. *Id.* at 38.

The Magistrate Judge also rejected Okavage's attempted monopolization claim, finding that the SAC did not adequately allege a dangerous probability of monopolization. *Id.* 40–43. Specifically, the Report again declined to credit the SAC's allegations concerning UWM's most recent 54% market share in favor of its average market share for the year ending 2022. *Id.* ¶104. The Report also declined to credit the SAC's allegations concerning Mr. Ishbia's public statements that UWM has

"great control of our margins," and that "we do control the margins in this industry," *id.* at 43 (citing SAC ¶109), reasoning that the SAC failed to provide "context" for these statements or "any supporting facts," *id.*

The Report also concluded that the SAC did not adequately allege a specific intent to monopolize, stating that an attempt to eliminate Rocket and Fairway from the market does not suggest injury to competition generally. *Id.*

Finally, the Report recommended dismissal of Okavage's claims for tortious interference, violations of Florida's Deceptive and Unfair Trade Practices Act (FDUP-TA) and Florida's Antitrust Act, and declaratory judgment. *Id.* at 44–48. Having concluded that the SAC failed to adequately allege an underlying intentional tort (specifically, tortious interference), the Report also concluded that the corporate shield doctrine precluded personal jurisdiction over Mr. Ishbia. *Id.* at 13–14.

### 2. Okavage's Objections to the Report

On March 15, 2024, Okavage filed objections to the Report as to all claims except tortious interference ("Objections"). Dkt. 116. The Objections addressed each of the issues addressed above, and incorporated Okavage's earlier briefing on the Motion to Dismiss. *See generally id.*; *Id.* at 4 n.1.

### 3. The District Court's Order

On September 23, 2024, the District Court issued an order adopting and confirming the Report and dismissing the SAC without prejudice ("Order"). Dkt. 125. The District Court concluded that the SAC failed to state a per se antitrust violation, rea-

soning that the SAC's allegations of broker communications were conclusory and failed to establish that brokers "would not have agreed absent an understanding that the other brokers would follow suit." *Id.* at 3. The District Court stated that the presence of dissenting brokers militated against a finding of agreement. *Id.*

The District Court also rejected, without analysis, Okavage's argument under *Northwest Wholesale Stationers* regarding the relevant market. *Id.* at 6. With regard to market share, the District Court faulted Okavage for "not explain[ing] why fifty-four percent of the 'broker channel' is the same as market share." The District Court also faulted Okavage for allegedly failing to explain why the 54% figure was "the most relevant figure." *Id.*

With regard to market power, the District Court concluded that the power to impose burdensome terms applies only to "buyers" of UWM's services (i.e. consumers) and not to "intermediaries" like wholesale mortgage brokers. *Id.* at 8.

The District Court dismissed Okavage's rule-of-reason argument largely on the basis that it presented only a "rehash" of the arguments made to the Magistrate Judge. *Id.* at 9. The court also concluded that although the Report did fail to address allegations and legal authority regarding the effects of the Ultimatum and boycott on the "autonomy of the marketplace," courts do not consider that issue "absent a showing of market power or control." *Id.*

The District Court did not address the Report's conclusions on the attempted monopolization claim, effectively affirming the Report's reasoning. Concluding that Okavage's remaining claims hinged on the success of its antitrust allegations, the District Court determined that it need not address them. *Id.* at 10.

## II.  SUMMARY OF THE ARGUMENT

In granting Defendants' motion to dismiss Okavage's supplemental class action complaint and in rejecting Okavage's objections to the Report, the District Court (and the Report which the District Court accepted) made a series of legal errors:

1. The District Court concluded that detailed factual allegations involving expressions of agreement as well as invitations to collude were inadequate to support an antitrust conspiracy claim. In doing so, the District Court rejected detailed factual allegations that were plainly plausible under the standard set in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

2. The District Court rejected numerous allegations as "conclusory," when these factual allegations were more than sufficiently specific under *Twombly*.

3. The District Court weighed conflicting evidence, contrary to the rule that allegations need only be plausible to state a claim. Instead, the District Court rejected allegations when it believed that other conclusions were more likely to be true, directly contrary to the mandate in *Twombly* that courts are not to "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 545, 556. In other cases, the District Court failed to address significant factual allegations made by Okavage supporting its claims.

4. The District Court also failed to address case law setting forth the standard applicable to Okavage's claims which its allegations clearly satisfy.

The District Court's approach as a whole, if accepted, would create an impossible burden for any antitrust plaintiff, especially in a conspiracy case such as that

19

alleged by Okavage, where the proofs are largely in the possession of the co-conspirators. *Cox v. Adm'r U.S. Steel & Carnegie*, 7 F.3d 1386, 1400 (7th Cir. 1994). The decision should be overturned so that Okavage can pursue discovery to prove its plausible claims.

## III.  STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).

### A.  Standard Applicable to Motions to Dismiss

When considering a motion to dismiss, a district court must "view the allegations of the complaint in the light most favorable to the plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences therefrom." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

Allegations of an agreement to restrain trade in violation of the Sherman Act must "plausibly suggest[,] not merely [be] consistent with, a conspiracy or agreement." *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1332–33 (11th Cir. 2010) (cleaned up). But the plausibility standard is not akin to a *probability* requirement, as plausibility requires only that a plaintiff demonstrate "more than a sheer possibility that defendant acted unlawfully." *Love v. Weeco (TM)*, 774 F. App'x 519, 521 (11th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

20

Where there are two reasonable interpretations of the evidence, this is not a reason to grant a motion to dismiss, as all plausible inferences are to be drawn in favor of the plaintiff at the motion to dismiss phase. As the Sixth Circuit explained in *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011), "[o]ften, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *See also Evergreen Partnering Grp., Inc. v. Proactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) *(Evergreen)* ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since the questions are properly left to the factfinder."). The Supreme Court has explained in the antitrust context that "the choice between two reasonable interpretations is for the jury." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) *(Monsanto)*. After all, "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### B. The Twombly Standard in Antitrust Cases

These same principles apply in antitrust conspiracy cases, where the proof is largely in the hands of the alleged conspirators. *Cox, supra* at 1400 ("[S]ummary procedures should be used sparingly [in complex antitrust litigation] where motive and intent play leading roles, [because] the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." (citation omitted)). For this reason, plaintiffs need not plead direct evidence of agreement; circumstantial

evidence is sufficient. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010) (holding that at the complaint stage, "plaintiffs have conducted no discovery" which "may reveal the smoking gun"). "Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences." *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989).

While more than bare bones allegations of parallel conduct are necessary to state an antitrust conspiracy claim, great detail is not required to meet the *Twombly* requirements. *Twombly*, 550 U.S. at 564. At the pleading stage, a complaint claiming conspiracy must only provide "*some* factual context suggesting agreement." *Id.* at 549 (emphasis added). As the Supreme Court also explained in *Twombly*, though the complaint offered no "specific time, place or person involved in the alleged conspiracy," *id.* at 565, n.10, the Supreme Court stated that "our concern is not that the allegations in the complaint were insufficiently 'particularized'." *Id.* at 569 n.14 (brackets omitted). In *Evergreen, supra*, the court criticized the district court for requiring "highly specific details" in an antitrust complaint. *Evergreen*, 720 F.3d at 50. The First Circuit has explained that an antitrust plaintiff must allege only the "general contours" of when an agreement was made. *Id.* at 46.

## IV.   ARGUMENT

### A.   The District Court Erred in Rejecting Detailed Allegations of a Relevant Submarket

The District Court rejected Okavage's argument that the SAC adequately alleges a wholesale submarket based on its finding that the allegations in the complaint were too "conclusory." This finding directly contradicts *Twombly*, which made clear that detailed allegations are not necessary to meet the plausibility requirement, as long as they are factual, and not mere legal conclusions. *Twombly*, 550 U.S. at 544; *see also Jackson*, 753 F. App'x 866, 869 (11th Cir. 2018) ("To the contrary, *Iqbal* tells us we must assume the truth of all well-pleaded allegations except legal conclusions, regardless of whether evidence may ultimately support them."); Edward A. Hartnett, *Taming Twombly, Even After Iqbal*, 158 U. Pa. L. Rev. 473, 491 (2010) ("A conclusory allegation is one that asserts the final and ultimate conclusion which the court is to make in deciding the case, that is, one that alleges an element of a claim.").

The allegations in the SAC were quite detailed, addressing each of the submarket requirements under the Supreme Court's analysis in *Brown Shoe Co. v. U.S.*, 370 U.S. 294 (1962), and the many cases that have applied it. *See, e.g.*, *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993). SAC ¶¶20–35. The Supreme Court in *Brown Shoe* explained that "[t]he *outer boundaries* of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe, at 325*. But the Court went on to clarify that that the contours of a narrower submar-

23

ket can be determined by examining such "practical indicia" as "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

The SAC includes specific allegations that track the *Brown Shoe* criteria. The SAC alleges that the wholesale market has a distinct group of customers, *i.e.*, those who choose to utilize mortgage brokers. SAC ¶25.A. Those customers (and the brokers who work with them) recognize the wholesale market as a separate and distinct mortgage channel. *Id.* ¶25.B. The wholesale market also involves specialized vendors: mortgage brokers, who provide substantial services to consumers not available at retail. *Id.* ¶¶23, 25.C. Wholesale and retail lenders utilize distinct marketing efforts. *Id.* ¶¶24, 25.D. And wholesale customers will not readily switch to a retail lender for small differences in price due to the significant value of broker advice. *Id.* ¶25.E.

Courts "routinely rely" on these factors as a "useful analytical tool" in defining the product market. *See, e.g.*, *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51–60 (D.D.C. 2011) *(H&R Block)*; *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118, 118 n.11 (D.D.C. 2016) *(Staples II)*; *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27–33 (D.D.C. 2015) *(Sysco)*.

Numerous cases have, like Okavage has here, defined markets consisting of only one or more of the distribution channels for a product or service. *See FTC v. Staples*, 970 F. Supp. 1066, 1073–1075 (D.D.C. 1997) *(Staples I)* (holding that "the sale of consumable office supplies through office superstores" was a relevant market, even

24

though "all sellers [of office supplies] . . . at some level, compete with one another"); *Sysco*, 113 F. Supp. 3d at 27 (holding that the relevant market was "broadline foodservice distribution," not including other food distribution channels). "The mere fact that a [product] may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Staples I*, 970 F. Supp. 1066.

The court in *H&R Block*, 833 F. Supp. 2d at 54, for example, highlighted the digital do-it-yourself ("DDIY") tax return submarket's "unique technology, price, . . . and type of interaction by the consumer" as probative of its definition of the relevant submarket. Similarly, here, the SAC alleges that consumers interact differently in the wholesale submarket, dealing with brokers, not directly with the lender. SAC ¶¶20–21. It also alleges a unique process, undertaken by the mortgage brokers to determine which lenders to recommend. *Id.* ¶22. The SAC also directly addresses the difference in price between wholesale and retail mortgages. *See* discussion, *supra* at II.A.1; SAC ¶25.

Many courts have found such price differences as supportive of a separate submarket. *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 828–829 (11th Cir. 2015) (domestic fittings were a separate submarket due, in part, to the "higher prices for . . . domestic fittings"). In *Spirit Airlines*, the Sixth Circuit specifically recognized that the fact that "Northwest had separate fares for business travelers and leisure travelers" was supportive of a separate submarket for leisure travelers. *Spirit Airlines, Inc. v. Nw. Airlines*, 431 F.3d 917, 933–35 (6th Cir. 2005) *(Spirit Airlines)*. The same was true in *Staples II*, 190 F. Supp. 3d at 119.

25

The Report concluded that this evidence "actually constitutes evidence of the cross-elasticity of demand and reasonable substitutability of these products . . . ." Dkt. 112 at 31. But the Report does not include any analysis to support this counterintuitive conclusion. If two products were perfect substitutes for one another, one would expect that their prices would be identical.

UWM's identification of the wholesale channel as a separate market segment, SAC ¶26, also parallels the reasoning in these cases. The *H&R Block* court cited as significant evidence the fact that "HRB documents also evidence HRB's perception of a distinct DDIY market or market segment" and referred to an "HRB internal analysis discussing convenience and prices factors differentiating DDIY and assisted methods for consumers." *H&R Block*, 833 F. Supp. 2d at 53.

It is true that many of the allegations in the SAC regarding the relevant market describe general characteristics of the industry, rather than specific actions taken by particular actors. But that is precisely the kind of evidence that the courts rely upon in deciding whether the *Brown Shoe* criteria apply, and the *Brown Shoe* Court itself discuss general market characteristics. *See* discussion, *supra*. Requiring greater details on "who, what, when, where" would not only contravene the principles in *Twombly*, but would make no sense in the context of assessment of an entire market. The allegations here are certainly not the "final and ultimate conclusions" that Okavage asks the court to reach. *See Hartnett*, *supra*.

The District Court's dismissal of Okavage's allegations as "conclusory" is also directly contrary to the case law on market definition, which holds that "[t]he relevant market is essentially a question of fact." *T. Harris Young & Assocs., Inc. v.*

*Marquette Electronics, Inc.*, 931 F.2d 816, 823 (11th Cir. 1991); *see also Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *E.I. du Pont de Nemours v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) ("[D]ismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market [altogether]." (quotations and citation omitted)).

The Report faulted Okavage for "not discuss[ing] why a consumer using a retail lender could not obtain advice from a professional," such as a "real estate agent or a retail lender." Dkt. 112 at 31, 32. But this hypothetical supposition by the Magistrate Judge is inconsistent with the allegations of the SAC, which state that the consumers either obtain advice from a mortgage broker or obtain loans directly from retailers. There are no facts in the SAC to suggest that there are alternative substitute mechanisms that are available to consumers. Moreover, as the SAC explains, the point of using a mortgage professional is to allow someone to choose between lenders. No retail lender could be expected to undertake this function.

In any event, as the Supreme Court made clear in *Brown Shoe*, *supra*, the mere fact of possible substitutability (between a mortgage broker and a hypothetical real estate agent-advisor) may be relevant to the "outer boundaries" of a market, but does not justify rejection of a submarket analysis. *Brown Shoe*, 370 U.S. at 325.

Finally, definition of a relevant market is not critical to Okavage's claims. Even in the absence of *per se* liability, an unreasonable restraint of trade can be proven through direct evidence of effects on consumers without proof of a relevant market.

27

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) *(Indiana Fed'n of Dentists)* (holding that there is no need to examine "market definition and market power" where there is evidence of "actual detrimental effects"). *See* discussion of direct effects, *infra* at Section III.A. For this reason, the District Court's error in rejecting well-pleaded allegations of direct effects, *see* discussion, *infra* at Section VI.C.1, provides another reason why the District Court's dismissal based on relevant market allegations was in error.

### B.   The District Court Erred in Rejecting Well-Pleaded Allegations Supporting Okavage's *Per se* Antitrust Claim

#### 1.   Okavage Plausibly Alleged a Horizontal Agreement

As described in the Statement of the Case, *supra*, the SAC contains extensive allegations of concerted action by thousands of mortgage brokers. The District Court's conclusion that the SAC failed to plausibly allege an agreement between the brokers was contrary to both the plain language of the SAC and the case law, for numerous reasons set forth below.

##### a.   The SAC Adequately Pleaded the Existence of an Agreement Among Brokers.

The District Court was "unpersuaded that Plaintiff has plausibly alleged anything more than knowledge by UWM brokers that other brokers intended to assent to the ultimatum . . . ." Doc. 125 at 3. But allegations of the sort described by the District Court would involve nothing more than Broker A saying that it intended to agree to

the Ultimatum in a communication to Broker B. By contrast, the SAC establishes that brokers did not simply state their own individual intentions, but clearly indicated their intention that all brokers join the boycott together:

- "We are ALL IN"

- "Unstoppable together…"

- "We are all family!"

- "All for one and one for all."

- "Team broker"

SAC ¶41. Such statements go beyond words of individual intent: they convey a "meeting of the minds" and "a conscious commitment to a common scheme," which is all that must be pleaded at this stage of litigation. *Monsanto*, 465 U.S. at 764, 768 (citations and quotations omitted). Indeed, one definition of "all in" is "fully committed to or involved in something." *All in*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/all-in (last accessed Dec. 23, 2024)"All in" certainly plausibly indicates "we agree." "All for one and one for all" is a colorful way of saying "we agree." *All for one and one for all*, Dictionary.com, https://www.dictionary.com/browse/all-for-one-and-one-for-all (last accessed December 26, 2024) ("All the members of a group support each of the individual members, and the individual members pledge to support the group.").

Mr. Ishbia's own statements also provide specific and direct evidence of agreement. Speaking on behalf of UWM, Mr. Ishbia asserted that "all of our current clients [*i.e.*, the brokers] are aligned" with respect to the Ultimatum and have "locked arms with us." SAC ¶42. "Aligned" and "locked arms" certainly imply more than the mere existence of individual, unilateral decisions; they are terms that signal the presence of an agreement to act in concert. The Cambridge Dictionary defines "lock arms" through a list of synonyms, which include "unite," "join together," and "become one voice." *Lock Arms*, Cambridge Dictionary, https://dictionary.cambridge.org/thesaurus/lock-arms (last accessed Dec. 23, 2024).

To say that these statements do not "plausibly" suggest an agreement would completely distort the meaning of plausibility. They provide far "more than a sheer possibility" of agreement. *Iqbal*, 556 U.S. at 678.

The District Court's contrary conclusion apparently invokes *In Re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3rd Cir. 2010), where the court indicated that mere knowledge is insufficient to allege an agreement. But the court there made clear that "proof that the defendants got together and exchanged assurances of common action" is sufficient "evidence implying a traditional conspiracy." *Id.* The communications alleged in the SAC certainly involve both such a "get together" and such assurances. It is hard to interpret the statements regarding the parties being "all in," "unstoppable together," "all family," "all for one" and the others cited above as anything other than "assurances of common action."

Significantly, these communications occurred in *real time* during a *live event* at which UWM's CEO revealed the Ultimatum. There can be little doubt that had these

statements been made in person, behind closed doors, in a "smoke-filled room," they would be viewed as the proverbial "smoking gun." The fact that they were made publicly online does not change the analysis a whit.

### b. In the Alternative, the SAC Adequately Pleaded the Existence of Invitations to Collude.

The District Court also failed to acknowledge that statements such as "unstoppable together," "brokers are better when we work together," and "we don't go against our family" are at the very least invitations to the other brokers to join in agreement. Such "invitations to collude" constitute significant evidence of agreement. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d at 1372, *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per curiam) ("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy.").

The District Court erroneously focused on the SAC's single allegation regarding a dissenting broker, SAC ¶43, stating that "[t]here are only minimal allegations regarding pushback on dissenting brokers . . . ." Dkt. 125 at 4. Since only a single example of dissent is noted, and in that single case "push back" occurred, it was erroneous to conclude that this was "minimal." Moreover, a plaintiff need not establish total agreement or uniformity of action among all conspirators, nor that all prospective conspirators agreed to partake in the conspiracy, in order to plausibly allege or prove a conspiracy. For example, in *Anderson News, L.L.C. v. Am. Media, Inc.*, 630 F.3d 162, 168–70 (2d Cir. 2012), a conspiracy was adequately alleged, de-

spite the fact that not all parties asked to partake in the boycott agreed. *See also U.S. v. Beaver*, 515 F.3d 730, 735 (7th Cir. 2008) (finding a price-fixing conspiracy despite such frequent cheating by co-conspirators); *U.S. v. Andreas*, 216 F.3d 645, 679 (7th Cir. 2000) (holding that cheating cartel members did not negate conspiracy's existence).

Here, the SAC alleges that more than 90% of the brokers—more than 11,000—agreed. SAC ¶61. At the very least, that percentage certainly is significant evidence supporting an inference of agreement.

### c. Group Boycotts May Be Proven by Parallel Conduct and Plus Factors Suggesting Agreement

The District Court further failed to adequately address the SAC's specific allegations concerning the existence of critical plus factors, which can be used to infer the existence of an agreement. Allegations of parallel conduct in conjunction with "sufficient 'plus factors' . . . make the parallel conduct 'more probative of conspiracy than of conscious parallelism." *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (quoting *Quality Auto. Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1262 (11th Cir. 2019) (en banc)).

The Court concluded erroneously that Okavage alleged nothing more that "parallel conduct without any 'plus' factors." Dkt. 125 at 3. In fact, at least three different plus factors were addressed.

One critical "plus factor" is the high level of inter-broker communications identified in the SAC. Numerous courts have held that parallel behavior coupled with interfirm communications is sufficient to prove a conspiracy, even at the summary judgment stage. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) ("Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *see also In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. 1981) (finding that parallel conduct "plus direct evidence of communication between [competitors] on pricing policy" adequately supported a jury verdict on price-fixing).

Second, the SAC points to statements by the Association of Independent Mortgage Experts ("AIME"), a trade association of brokers, in which the organization endorsed the Ultimatum. SAC at ¶¶45–46. "[P]articipation in a trade association, where the defendants had opportunities to exchange information or make agreements, coupled with allegations of parallel conduct, are sufficient to tie the defendants to the conspiracies." *In re Salmon*, 2021 WL 1109128, at *16 (S.D. Fla. Mar. 23, 2021).

That AIME, an organization comprised of and governed by member brokers, endorsed the Ultimatum plausibly creates the inference that its member brokers agreed to join the resulting boycott. *See, e.g.*, *California Dental Ass'n v. FTC*, 128 F.3d 720 (9th Cir. 1997), *rev'd on other grounds*, 526 U.S. 756 (1999) ("Professional associations are 'routinely treated as continuing conspiracies of their members'" (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988)).

Third, although the District Court concluded otherwise, the SAC alleges very specific facts more than plausibly suggesting that the brokers acted against their individual self-interests in boycotting Rocket and Fairway. The District Court rejected allegations concerning brokers' abrupt "about face," labeling these allegations as "conclusory." Dkt. 125 at 4–5. However, the District Court failed to acknowledge the very specific facts highlighted in the SAC. For example, ¶¶32B and C and ¶34 included specific allegations that Rocket offered significant advantages to brokers and their customers, including better prices, better service according to a recognized study, and the willingness to serve customers with lower credit scores. The boycotting brokers gave up the opportunity to provide these advantages to their customers.

Moreover, the SAC specifically alleges that, in the years preceding the boycott, Rocket's wholesale business increased from 3,000 mortgage broker partners to 10,000." SAC ¶35. This is a clear indication that the brokers, when acting unilaterally, saw a benefit to utilizing Rocket. Immediately after the Ultimatum, 93% of the brokers presented with the Ultimatum—joined the boycott.

The Magistrate Judge (and the District Court) found the allegations "inadequate to *establish*" (emphasis added) that signing was against the interest of the brokers because "it seems equally likely" that the brokers individually preferred to obtain UWM loans rather than continue working with Rocket and Fairway. Dkt. 112 at 25; Dkt. 125 at 3. These conclusions were erroneous for several reasons. First, it is not necessary that Okavage "establish" anything. The allegations discussed above certainly plausibly suggest an action against interest.

34

Second, even if alternative inferences could not be ruled out at this stage, that does not mean that the claim is not plausible. As the Sixth Circuit explained in *Watson*, *supra*, "[o]ften, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." 648 F.3d at 458.

Third, the SAC specifically explains that if the brokers had not acted collectively, brokers who cut off Rocket and Fairway would have faced the risk that they would lose business to other brokers who offered Rocket's and Fairway's lower cost, high quality loans. Acting together substantially reduced those risks, because it provided assurances that the agreeing brokers would all give up the competitive advantage from being able to use Rocket or Fairway. SAC ¶66. For this reason, the District Court's conclusion that "the brokers were harmed either way." Dkt. 125 at 5, was erroneous. As the SAC alleges, the brokers acknowledged by their own statements that they were "unstoppable together." SAC ¶41. That certainly indicates the need for collective action.

Allegations like Okavage's have been viewed by many courts as compelling evidence of conspiracy. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992) (discussing the holding in *Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564 (3d Cir. 1986), that evidence was sufficient to withstand summary judgment where "GM had favorably viewed Arnold Pontiac's franchise application until after the GM dealers collectively expressed disapproval and threat-

ened non-cooperation"); *see also MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002).

### d.   The District Court's Other Errors

The District Court also erroneously found no agreement because "there are no factual allegations that brokers . . . were told that the change would only be made with a majority agreement, or that a majority agreement was necessary to reach the desired result." Dkt. 125 at 4. But no court has held that such a requirement is essential to a plausible allegation of conspiracy. Moreover, Mr. Ishbia's assurances that all of UWM's brokers were "aligned" and had "locked arms," SAC ¶41, and that "everybody is going to sign," *Id.* ¶51, provided assurances to the brokers that most of them would, indeed, agree to the boycott. Indeed, the fact that Mr. Ishbia provided these assurances plausibly indicates that he recognized that brokers would not have acted unless they were assured that other competing brokers would take the same action.

The District Court's efforts to distinguish *U.S. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) were also in error. The Second Circuit found that "Apple coordinated phone calls between the publishers who had agreed and those who remained on the fence" in furtherance of the conspiracy. *Id.* at 319. The Second Circuit also noted that Apple "endeavored to assure the publishers that they weren't going to be alone . . . ." *Id.* (brackets omitted).

The SAC alleges analogous facts: (1) UWM responded to other brokers who had concerns, SAC ¶53; (2) UWM established a live forum for brokers to discuss the Ultimatum with one another, *id.* ¶49; and (3) UWM worked with brokers who, in turn, could pressure other brokers to sign the addendum, *id.* ¶44. The SAC also alleges that Mr. Ishbia, like Apple, endeavored to assuage hesitant brokers' concerns by stating all the brokers would sign. SAC ¶¶41, 51. UWM's account executives contacted brokers who had not yet signed the addendum and "falsely asserted that that mortgage broker was the only one who had not yet accepted" it. *Id.* ¶56. Moreover, the facts alleged here are much stronger than in *Apple*, since the assurances were also made by the brokers themselves. The statements regarding the "all in" nature of the brokers' actions provided assurances to other brokers that they would be acting as part of a larger group.

The District Court erred by determining that because the publishers in *Apple* "expressed an interest in coordinated efforts to raise prices before Apple introduced the vehicle to do so," the facts of the case are inapplicable to those present here. But the fact that UWM's actions triggered the boycott does not change the conclusion that there was a conspiracy here. Just "[b]ecause one is coerced by economic threats to participate in or aid and abet in an illegal scheme does not excuse the actor." *Flinkote Co. v. Lysfjord*, 246 F.2d 368, 376 (9th Cir. 1957).

In all, the District Court's opinion reads like a (highly questionable) decision on the merits after trial, to determine whether there had been adequate proof that the conspiracy existed. But the test at this stage is, of course, not probability but plausibility. The Supreme Court in *Twombly* made it clear that "a well-pleaded complaint

may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. That was not the kind of analysis performed by the District Court in this case.

### 2. Okavage Plausibly Alleged Market Dominance

The District Court also erred by rejecting Okavage's allegations regarding market dominance applicable to *per se* illegal boycott claims, described as "frequently" present in *per se* illegal boycotts in *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *see also id.* at 295 ("[A] concerted refusal to deal need not necessarily possess all of [the traits discussed above] to merit *per se* treatment.").

The District Court found Okavage's evidence of market dominance unpersuasive, claiming that "plaintiff fails to explain why its reliance on the 54% [market share] number is 'the most relevant figure'." Dkt. 125 at 7. The explanation is straightforward: As of the filing of the SAC, 54% was the most recent market share figure attained by UWM. SAC ¶ 104. As the SAC alleges, through the success of the boycott, UWM managed to increase its market share from 34% to 54%. SAC ¶¶ 63, 104.

The most recent, post-boycott market share figure is plausibly the most relevant in determining whether UWM was dominant. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 807d2 ("Where the defendant's market share rises substantially during the course of the challenged behavior, the later higher number is the one most relevant for determining the existence of a dangerous probability of suc-

cess.").[3] The District Court's insistence that the most recent yearly average share was more relevant involved an improper weighing of the evidence, and went far beyond the "plausibility" standard.

Even more significantly, the District Court completely failed to address the market dominance of the *boycotters*, i.e. the brokers who agreed to the Ultimatum. Yet that measure, which undisputedly is 55%, *see* discussion *supra* at Part II.A.6, is the relevant measure under *Northwest Stationers*: "frequently the *boycotting firms* possessed a dominant position in the relevant market." *Nw. Wholesale Stationers*, 472 U.S. at 294 (emphasis added).

Okavage also satisfied the "market dominance" standard by alleging that UWM was able to exclude competition, which is another recognized means of proving market power. *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 11 (1958). The Supreme Court has found market power existed where the defendant "ha[d] the power to raise prices or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers," *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503–504 (1969).[4]

---

[3]    The District Court also faulted Okavage for "not explain[ing] why fifty-four percent of the 'broker channel' is the same as market share." Doc. 125 at 7. But the "broker channel" and the "wholesale market" are industry terms signifying the same thing. *See* SAC ¶31 (referring to the "wholesale/broker channel").

[4]    While the District Court criticized Okavage's reference to tie-in cases as not analogous, *Northern Pacific Railway Co.* and *Fortner Enterprises* are cited not because they involve tying, but because they involve "the power to raise prices or impose other burdensome terms." A tie-in is only one example of such a burdensome term. As described below, this case involves a completely different burdensome term. Therefore, Okavage does not rely on any analogy to tie-in cases, except insofar as the Supreme Court used tying as one example of the principle we cite.

Contrary to the District Court's finding that the SAC's allegations on this issue were conclusory, the SAC alleges that 93% of UWM's brokers adhered to the boycott despite the fact it deprived the brokers of access to Rocket's and Fairway's lower priced, high-quality offerings. SAC ¶¶2, 35, 111. This specifically and plausibly alleges that requiring the brokers to forego the use of Rocket and Fairway was burdensome.

These three separate kinds of supporting factual allegations plausibly suggested that the boycotters possessed market dominance. The SAC's specific allegations of high barriers to entry also support this conclusion. *See* SAC ¶83. *See, e.g.*, *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1495 n.11 (11th Cir. 1988).

The Magistrate Judge effectively imposed a requirement that the SAC anticipate, and address, every possible counterargument on barriers to entry, in particular requiring that the SAC identify barriers to possible entry by retailers. No court has ever so held. A plaintiff "need not prove his case on the pleadings[.]" *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1386 (11th Cir. 2010).

In any event, the SAC clearly does allege barriers to entry that would preclude entry by retail lenders. For example, ¶83.C alleges that a new entrant must "overcome entrenched preferences among mortgage brokers . . . ." Thus, retail lenders would need to convince mortgage brokers to switch their allegiance to them. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common barriers of entry include . . . entrenched buyer preferences[.]").

This would be particularly difficult given UWM's track record of requiring that mortgage brokers not utilize the leading lenders who also sell in retail, Rocket and Fairway. SAC ¶¶54, 62. "Mr. Ishbia stated that [the Ultimatum and the accompanying boycott] could deter retail lenders from competing aggressively *in* the wholesale space." *Id.* ¶47. It is certainly plausible that this opposition, and the deterrent identified by Mr. Ishbia, creates a substantial barrier to entry by retailers.[5]

Additionally, barriers to entry into wholesale lending are irrelevant to the observation in *Northwest Stationers* that "frequently" the boycotters possessed a dominant market position. Since, as described above, the boycotters were the brokers, barriers to entry into wholesale lending are irrelevant to this issue.

Finally, a focus on barriers to entry as a requirement for plausible allegations of a *per se* claim imposes a barrier far greater than the undemanding standard for market dominance under *Nw. Stationers*. As the court held in *Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 936 (7th Cir. 2000)*, "[w]e have found that this case satisfies the criteria the Court used in *Northwest Stationers* for condemnation without any extensive inquiry into market power and economic pros and cons . . . 'dominant' is an undefined term, but [is] plainly chosen to stand for something different from antitrust's term of art 'monopoly.'"

---

[5]    Additionally, smaller retailers would face a barrier because they could not compete with UWM's scale, which Mr. Ishbia explained allowed it to automate its operations and create advantages in terms of efficiency and service. SAC ¶¶107-108. *See, e.g.*, *Eastman Kodak, 125 F.3d at 1208* (evidence that the defendant benefited from "economies of scale" supporting a finding of high barriers to entry).

### 3. The SAC Plausibly Alleges that the Boycott Cut Off Necessary Suppliers

The District Court and Magistrate Judge said that Okavage did not adequately allege that the boycott "cut off access to the wholesale market." Dkt. 112 at 27; Dkt. 125 at 6. But this misstates the *Nw. Stationers* standard, which states only that *per se* boycotts "frequently" involved a cut off, not of "access to the market," but of a "supply." *Nw. Wholesale Stationers*, 472 U.S. at 294. The SAC also plausibly alleges facts meeting the "cutoff" standard for *per se* illegality.

The SAC establishes that the supply from which Rocket and Fairway were "cut off" was one "necessary to enable the boycotted firm[s] to compete." *Id.* at 294. To meet this element of the *Northwest Stationers* standard, the denied services should provide "important business advantages" such that without them, parties would be "hampered substantially in [their] crucial endeavor." *Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963) (cited by *Nw. Wholesale Stationers*, at 294).

The SAC plausibly alleged facts that meet this standard. As the source of all referrals to lenders, the broker is essential to the functioning of the wholesale mortgage lending process. SAC ¶22. Brokers' critical role in the process is highlighted by Mr. Ishbia's own statements concerning the effects of the boycott by brokers. SAC ¶¶36, 61–62 ("[Rocket and Fairway] just lost 70%, 80%, 90% of their business."). Certainly a loss of 70%-90% of its business would substantially hamper a firm. It is unquestionably true that access to the thousands of brokers who utilize UWM provided an "important business advantage" to Rocket and Fairway, which they lost due to the boycott.

The District Court held that *Silver* was not analogous here. But *Silver* was specifically cited by the Supreme Court in *Nw. Stationers* as its support for the "cut off" requirement. Thus, the Supreme Court found the *Silver* analysis directly applicable.

### C. The District Court Erred in Rejecting Well-Pleaded Allegations Supporting Okavage's Rule-of-Reason Antitrust Claim

#### 1. The District Court Failed to Consider Well-Pleaded Allegations of Actual Anticompetitive Effects

The District Court also erroneously labeled the SAC's allegations of actual anticompetitive harm under its rule of reason claim as "conclusory assertions." Dkt. 125 at 9. An unreasonable restraint of trade must involve either "actual detrimental effects," or market power plus "the potential for genuine adverse effects on competition . . . ." *Indiana Fed'n of Dentists*, 476 U.S. at 460. As detailed below, the SAC plausibly alleged both types of unreasonable restraints of trade with more than the amount of specificity required to survive a motion to dismiss.

Direct harm can be shown by factors "such as reduced output, increased prices, or decreased quality . . . ." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The SAC very specifically alleges that the boycott has increased the costs and reduced the quality of mortgage loans by reducing the availability of lower priced, higher quality competitors. SAC ¶¶32(B), 32(C), 72, 73, 78. *See H&R Block*, 833 F. Supp. 2d at 79–80. In *Virgin Atl. Airways, Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264–265 (2d Cir. 2001), the court found that "consumers experienced a decrease in quality due to Virgin's delayed entry" because "Virgin offered higher quality ser-

vices than British Airways." The SAC specifically addresses comparisons between Rocket, Fairway, and UWM on quality and price, SAC ¶¶74, 76, and the decline in the availability of these lower cost, higher quality products to customers of the majority of brokers (55%) in the market.

The Magistrate Judge concluded that Okavage failed to allege that "the Ultimatum has increased the cost of mortgage loans for consumers." Dkt. 112 at 37. But the fact that consumers utilizing the majority of mortgage brokers could no longer access lower cost loans from Rocket or Fairway means that the cost to those consumers has increased.

The District Court determined that, because brokers were harmed whether or not they accepted the terms of UWM's boycott (in that they either were cut off from UWM or from Rocket and Fairway), this somehow detracted from Okavage's allegations of anticompetitive effects. But neither logic nor case law support such a finding, since it is the Ultimatum and the boycott that caused the restriction in choice and resulting harm. Restrictions on choice can also constitute anticompetitive effects. The "anticompetitive nature of the restraint" in *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 827 (6th Cir. 2011), was the reduction in competitive brokerage options available to home sellers?circumstances quite analogous to the restriction of consumers' lender options caused by the Ultimatum. *Id.* at 827, 829; *see also Indiana Fed'n of Dentists*, 476 U.S. at 459 (stating that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the marketplace,' cannot be sustained under the Rule of Reason" (citation omitted)).

Contrary to the assertions of the District Court, restrictions on mortgage brokers, who represent the interests of their clients, SAC ¶¶22, 50, are harmful to consumers. *See U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191–193 (3d Cir. 2005) (condemning exclusive arrangements imposed on dealers). The *Dentsply* court recognized that consumers derived a substantial benefit from dealers, "which as a class traditionally carries the products of multiple vendors." *Id.* at 192. The SAC alleges the very same facts as to brokers. SAC ¶¶20–25. Restrictions placed on brokers effectively limit the choices of consumers who relied on these brokers, and necessarily cause anti-competitive effects. *Id.* at 194.

The District Court attempted to distinguish *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815 on the ground that the court only considered the challenged conduct's anticompetitive tendency of interfering with the marketplace after it established that Realcomp possessed substantial market power. Doc. 125 at 9–10. But, as described below, the SAC does plausibly allege market power. As a result, the conclusion in *Realcomp II* that the restriction of choice is an indication of "anticompetitive tendencies" sufficient to plausibly suggest a violation of the rule of reason provides strong support for Okavage's claims. *See id.* at 823.

The Magistrate Judge also held that an antitrust violation could not exist if Rocket and Fairway were not completely expelled from the market. Dkt. 112 at 38. But, impeding competition short of complete expulsion of a competitor can certainly harm competition. *See Eastman Kodak*, 504 U.S. 451, 482–83 (1992) (holding that it is unlawful to "foreclose competition, *to gain a competitive advantage or* to deny a competitor" (emphasis added)). Similarly, in *Aspen Skiing v. Aspen Highlands*

*Skiing Corp.*, 472 U.S. 585 (1985) this Court made clear that it was "concerned with conduct which unnecessarily excludes or *handicaps* competitors," because this can have "the effect of impairing competition." *Id.* at 597 (emphasis added). As the Ninth Circuit explained, *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1274 (9th Cir. 2022) "[t]o adequately plead antitrust injury, a plaintiff need not allege that the exclusionary conduct has succeeded in displacing all competition."

The District Court rejected the majority of Okavage's arguments on competitive effects by saying that they were "a rehash" of arguments that were rejected by the Magistrate Judge. But if the Magistrate Judge erroneously failed to address applicable allegations and legal principles, it was appropriate to raise those arguments again before the District Court. *O'Brien v. Colvin*, 2014 WL 4632222, at *2 (E.D. Pa. Sept. 16, 2014) (finding that it is not "simply rehashing arguments already raised" when plaintiff "identif[ies] specific errors in the magistrate judge's analysis").

### 2. The District Court Erred in Rejecting the SAC's Allegations of UWM's Market Power

The District Court's rejection of the SAC's allegations regarding market power was also erroneous. While the District Court acknowledged that the ability to impose burdensome terms can provide separate evidence of market power, it claimed that there were no such allegations other than "conclusory" ones in the SAC. As described above, those allegations were quite specific.

The District Court also disputed whether "the power to impose burdens on an intermediary is relevant," since the cited cases involved customers, not intermediaries, such as brokers. Dkt. 125 at 8. But the burdensome terms identified—the unavailability of higher quality, lower priced mortgages offered by Rocket and Fairway—directly affects consumers, who would benefit from such higher quality, lower priced mortgages.

Moreover, numerous courts have found that successful imposition of burdensome terms on intermediaries, such as dealers, can be indicative of market power. This was the case in *Dentsply*, *supra*. There, Dentsply successfully imposed an "all-or-nothing" choice on dealers, akin to the Ultimatum in this case. *Dentsply*, 399 F.3d at 196. The Third Circuit held that "[t]he fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they have acceded to heavy economic pressure." *Id.*

The fact that UWM was successful in forcing consumers to accept loans that did not involve the lowest price, the best flexibility on credit scores, or other indicia of quality, is reflected in the fact that, as the SAC explains, Rocket's and Fairway's market shares dropped significantly after the boycott. SAC at ¶56. As Mr. Ishbia said "when we announced the [Ultimatum], they [Rocket] were more than twice my size overall, not wholesale, overall. Now I'm bigger than them." *Id*. ¶60. Clearly the burdensome terms were successfully imposed on the brokers and therefore on consumers. Mr. Ishbia further stated the "the penalty of working with Rocket . . . is you

don't get to work with UWM and *nobody is willing to take that chance*." *Id.* ¶59A. This is direct evidence of market power, from the Defendants' chief executive. It was erroneous for the District Court to fail to address this evidence in its analysis.

The SAC also identifies another important indicium of market power: Mr. Ishbia's remarks that UWM controls industry margins. SAC ¶109. Courts have long looked to control over margins—the difference between price and cost—as a measure of market power. Calculating a firm's market power according to its ability to control margins is often referred to as the Lerner Index. *Restore Robotics LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *7 (N.D. Fla. Feb. 7, 2022)) (collecting cases); *see also* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 92 (3d ed. 2005) ("[C]ourts have accepted that index as a valid method of identifying monopoly power."). The Magistrate Judge rejected these allegations because it stated that they lacked "context" or "supporting facts." Dkt. 112 at 43. But UWM's own CEO made this statement. This is enough to satisfy the plausibility requirement under *Twombly*. Okavage need not provide extensive proofs on every issue at this stage.

### D. The District Court Erred in Rejecting Well-Pleaded Allegations Supporting Okavage's Attempted Monopolization Claim

The District Court also erred in its acceptance of the Report's conclusion that the SAC did not adequately allege that UWM "has a dangerous probability of achiev-

ing monopoly power," as well as in its determination that the SAC provides no allegations which plausibly suggest UWM's specific intent to monopolize. Dkt. 125 at 10–11.

First, the SAC satisfies the "dangerous probability of success" element of attempted monopolization. A "majority position in the market,'" such as UWM's most recent 54% share, poses such a dangerous probability. *U.S. Anchor*, 7 F.3d at 1000 ("[A] dangerous probability of achieving monopoly power may be established by a 50% share."). As discussed above, Mr. Ishbia's admission that UWM controls the margins "in this industry" and has the ability to impose burdensome terms on brokers is further evidence of monopoly power, and is sufficient to allege a dangerous probability of such power. For the reasons discussed above, the Report's and District Court's criticisms of the allegations of a 54% share do not provide a reason to reject the plausibility of these allegations.

The SAC's allegations of substantial consolidation in the wholesale market provide further support on this issue. SAC ¶28 (quoting statement by UWM); *see Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (holding that a "consolidation trend in the market" makes successful monopolization more likely). According to Mr. Ishbia, UWM enjoys significant competitive advantages over smaller competitors because of its "scale." SAC ¶63.

UWM's dramatic growth in market share (from 34% to 54%) also supports an inference of dangerous probability. *Nobody in Particular Presents, Inc. v. Clear Channel Comm's, Inc.*, 311 F. Supp. 2d 1048, 1103 (D. Colo. 2004) ("[W]hen the

defendant's market share grows significantly in a short period of time, while the market share of its major competitors shrinks significantly in a short period of time, a probability of monopolization may exist.").

Second, the SAC also properly alleges a specific intent to monopolize. The SAC alleges that Mr. Ishbia deliberately instituted the boycott in order to drive out UWM's primary competitors, Rocket and Fairway, from the wholesale market, which would inevitably give UWM a dominant market position. SAC ¶37 (purpose of boycott is to prevent competition from retail lenders like Rocket and Fairway); ¶38 (falsely accuses Rocket of soliciting broker clients to dissuade them from working with Rocket); ¶40 (Ishbia demanded that brokers refuse to deal with Rocket and Fairway); ¶47 (UWM encouraged brokers to boycott in order to retaliate against, and deter, retail competition); ¶51 (Ishbia states that "everyone's going to sign an addendum that says 'hey listen, we're not working with those two lenders'"); ¶61 (Ishbia predicts that Rocket and Fairway will lose 70–90% of their business due to the boycott); ¶62 (Ishbia predicts that UWM will surpass Rocket in total mortgage business due to the boycott); ¶103.A (Ishbia states "nobody is willing to take t[he] chance" of not being able to work with UWM); ¶105 (Ishbia states, "[w]hen we announced the [Ultimatum], they [Rocket Mortgage] were more than twice my size overall, not wholesale, overall. Now I'm bigger than them"). He then took actions which carried out this intent by depriving Rocket and Fairway of more than half the brokers in the market. ." SAC ¶¶27, 61 (Ishbia states that more than 93% of its brokers—60% of all wholesale mortgage brokers—agreed to join the boycott). It is well established in case law that to adequately allege specific intent to monopolize,

a plaintiff does not need to provide direct evidence; rather specific intent may be inferred either from a defendant's words or a defendant's anticompetitive behavior. *See, e.g.*, *Gen. Inds. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) ("Specific intent [to monopolize] need not be proven by direct evidence, but can be inferred from the defendant's anticompetitive practices."). *See also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) (inferring specific intent to monopolize through defendant executives' "affirm[ations] [of] their stated goal of preventing Tops from entering the market.); *Kelco Disposal, Inc. v. Browning-Ferris Inds. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988) (inferring specific intent to monopolize from evidence that defendant executives "frequently reaffirmed their goal of driving [plaintiffs] out of the Burlington market.").

### E.   Okavage's Remaining Claims

The District Court dismissed Okavage's remaining claims, including violations of Florida's Deceptive and Unfair Trade Practices Act (FDUPTA), declaratory judgment, personal jurisdiction over Mr. Ishbia, and Mr. Ishbia's personal liability based solely on its rejection of Okavage's antitrust claims. Dkt. 125 at 10.

The Magistrate Judge similarly concluded that Okavage's remaining FDUPTA and declaratory judgment claims depended on the success of the antitrust claims, and therefore did not substantively address them. Dkt. 112 at 47–48. Although the District Court did not address it, the Magistrate Judge also concluded that the court lacked personal jurisdiction over Mr. Ishbia because his connection to Florida was solely through his role as CEO of UWM, and therefore the SAC "c[ould] not over-

come the corporate shield doctrine." Dkt. 112 at 12–13. The Magistrate Judge acknowledged that "the corporate shield doctrine does not protect a corporate officer who commits intentional torts," but concluded that because it was dismissing Okavage's tortious interference claim, it could not serve as a jurisdictional hook. *Id.* at 13–14. Notably, however, antitrust violations are themselves intentional torts. *Advanced Cartridge Tech., LLC v. Lexmark Int'l, Inc.*, 2011 WL 6719725, at *3 (M.D. Fla. Dec. 21, 2011); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999).

Thus, should the Court determine that Okavage adequately pleaded its antitrust claims, the District Court's dismissal of the SAC should be reversed in its entirety and these outstanding claims should be considered on their own merits.

## V.　CONCLUSION

For the foregoing reasons, Okavage respectfully requests that the Court reverse the District Court's dismissal of the SAC.

<br>

|  | Parrish & Goodman |
|---|---|
|  | Respectfully submitted, |
| Dated: December 27, 2024 | By: /s/ Robert Goodman |
|  | Attorney for Plaintiff - Appellant |
|  | THE OKAVAGE GROUP, LLC |

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,592 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Times New Roman**, using TypeLaw.com's legal text editor.


Dated: December 27, 2024          By:  /s/ Robert Goodman

**Certificate of Service**

I hereby certify that I electronically filed the foregoing **APPELLANT'S BRIEF** with the Clerk of the Court by using the Appellate CM/ECF system on **December 27, 2024**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Parrish & Goodman

Respectfully submitted,

Dated: December 27, 2024        By: /s/ Robert Goodman

Attorney for Plaintiff - Appellant
THE OKAVAGE GROUP, LLC