No. 24-13393

---

In the United States Court of Appeals
for the Eleventh Circuit

---

THE OKAVAGE GROUP, LLC,

*Plaintiff-Appellant,*

v.

UNITED WHOLESALE MORTGAGE, LLC, and MATHEW ISHBIA,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Middle District of Florida
No. 3:21-cv-00448
Hon. Wendy W. Berger

---

RESPONSE BRIEF OF DEFENDANTS-APPELLEES
UNITED WHOLESALE MORTGAGE, LLC AND MATHEW ISHBIA

---

Gregory E. Ostfeld
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
(312) 456-8400

Glenn E. Goldstein
Sabrina D. Niewialkouski
GREENBERG TRAURIG, LLP
401 East Las Olas Blvd., Suite 2000
Fort Lauderdale, FL 33301
(954) 768-8205

Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
(305) 579-0500

*Counsel for Defendants-Appellees*
*United Wholesale Mortgage, LLC and Mathew Ishbia*

## DEFENDANTS-APPELLEES' CERTIFICATE
## OF INTERESTED PERSONS

In the matter of *The Okavage Group, LLC vs. United Wholesale Mortgage, LLC and Mathew Ishbia*, Appeal No. 24-13393, pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Defendants-Appellees United Wholesale Mortgage, LLC and Mathew Ishbia certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.    Benayoun, Avi (Counsel for Defendants-Appellees)

2.    Berger, The Honorable Wendy W. (District Court Judge)

3.    Cech Samole, Brigid F. (Counsel for Defendants-Appellees)

4.    Goldstein, Glenn E. (Counsel for Defendants-Appellees)

5.    Goodman, Robert H. (Counsel for Plaintiff-Appellant)

6.    Greenberg Traurig, LLP (Counsel for Defendants-Appellees)

7.    Greenberg Traurig, P.A. (Counsel for Defendants-Appellees)

8.    Ishbia, Mathew (Defendant-Appellee)

9.    Lothman Lambert, The Honorable Laura (Magistrate Judge)

10.    Niewialkouski, Sabrina (Counsel for Defendants-Appellees)

11.    Ostfeld, Gregory E. (Counsel for Defendants-Appellees)

12.    Parrish & Goodman PLLC (Counsel for Plaintiff-Appellant)

13.    Parrish, Joseph E. (Counsel for Plaintiff-Appellant)

14.    SFS Holding Corp. (Indirect Parent Company of United Wholesale Mortgage, LLC f/k/a United Shore Finance Services LLC)

15.    Shaw, Megan E. (Counsel for Plaintiff-Appellant)

16.    The Okavage Group, LLC (Plaintiff-Appellant)

17.    United Wholesale Mortgage, LLC f/k/a United Shore Finance Services LLC (Defendant-Appellee)

18.    UWM Holdings Corporation (Indirect Parent Company of United Wholesale Mortgage, LLC f/k/a United Shore Finance Services LLC)

19.    UWM Holdings, LLC (Direct Parent Company of United Wholesale Mortgage, LLC f/k/a United Shore Finance Services LLC)

## DEFENDANTS-APPELLEES' CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendants-Appellees United Wholesale Mortgage, LLC and Mathew Ishbia make the following statement as to corporate ownership:

Defendant-Appellee, United Wholesale Mortgage, LLC f/k/a United Shore Finance Services LLC ("UWM"), is a limited liability company headquartered in Pontiac, Michigan whose direct parent company is UWM Holdings, LLC and whose indirect parent companies are SFS Holding Corp. and UWM Holdings Corporation. UWM Holdings Corporation is an entity currently holding a 9.9% economic interest in UWM Holdings, LLC. UWM Holdings, LLC is the sole manager of UWM and holds a 100% economic interest in UWM. SFS Holding Corp. is an entity currently holding a 90.1% economic interest in UWM Holdings, LLC.

Defendant-Appellee, Mathew Ishbia, is an individual and has no corporate ownership to disclose.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Rule 34(a)(1) and (2) of the Federal Rules of Appellate Procedure, Defendants-Appellees United Wholesale Mortgage, LLC, and Mathew Ishbia respectfully submit that oral argument is unnecessary for this appeal, because: (A) the appeal is frivolous; (B) the dispositive issue or issues have been authoritatively decided; or (C) the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

**Page**

DEFENDANTS-APPELLEES' CERTIFICATE OF INTERESTED PERSONS ................................................................................C-1

DEFENDANTS-APPELLEES' CORPORATE DISCLOSURE STATEMENT .......................................................................................C-3

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF AUTHORITIES ................................................................................v

STATEMENT OF THE ISSUES................................................................................1

STATEMENT OF THE CASE................................................................................2

   I.   Introduction ................................................................................2

   II.  Nature of the Case ................................................................................4

   III. District Court Proceedings and Disposition ....................................5

STATEMENT OF THE FACTS ................................................................................7

   I.   Plaintiff Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway.................................7

   II.  UWM's Share of the Highly Competitive Residential Mortgage Lending Market................................................................................8

   III. UWM Announced the All-In Initiative to Combat Practices It Believes Are Harmful to the Wholesale Lending Channel. ..........................................9

   IV. Plaintiff and Other Brokers Remain Free to Choose Their Wholesale Lenders. ................................................................................11

   V.  Plaintiff's Allegations Regarding the Effects of the Amendment .................12

SUMMARY OF THE ARGUMENT ................................................................13

ARGUMENT ................................................................................15

   I.   Standard of Review. ................................................................................15

## TABLE OF CONTENTS
### (Continued)

**Page**

II.  The District Court Correctly Dismissed All Claims Against Mr. Ishbia for Lack of Personal Jurisdiction.................................................16

III.  The District Court Correctly Dismissed Plaintiff's Antitrust Claims Because Plaintiff Failed to Plead the Relevant Market Is the "Wholesale Lending Market."...........................................................................19

IV.  The District Court Correctly Dismissed Plaintiff's Claims for a Per Se Illegal Group Boycott. .................................................................27

   A.  Plaintiff Failed to Plead a Horizontal Agreement or a Hub-and-Spoke Conspiracy Between UWM and Its Mortgage Brokers. ............................27

      1. Plaintiff's Allegations of Broker Support Do Not Plead a Horizontal Agreement. ........................................................30

      2. Plaintiff Has Not Alleged an Invitation to Collude. ...........................32

      3. Plaintiff Has Not Alleged Plus Factors...................................33

      4. Plaintiff Has Not Established Any "Other Errors.".............................37

   B.  Plaintiff Failed to Plead Market Power or Dominance. ............................38

   C.  Plaintiff Failed to Plead the All-In Initiative Cut Off Necessary Suppliers. ..........................................................................43

V.  The District Court Correctly Dismissed Plaintiff's Rule of Reason Claims for Unreasonable Restraint of Trade.................................44

   A.  Plaintiff Failed to Plead the Potential for a Genuine Adverse Effect on Competition. ..........................................................45

   B.  Plaintiff Failed to Plead an Actual Detrimental Effect on Competition. ....47

VI.  The District Court Correctly Dismissed Plaintiff's Attempted Monopolization Claim.......................................................50

**TABLE OF CONTENTS**
**(Continued)**

**Page**

VII. The District Court Correctly Dismissed Plaintiff's Derivative State
    Law Claims. ................................................................................................53

CONCLUSION ........................................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................................56

CERTIFICATE OF SERVICE ...............................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*,
    849 F.2d 1336 (11th Cir. 1987) .........................................................................20

*In re Aggrenox Antitrust Litig.*,
    199 F. Supp. 3d 662 (D. Conn. 2016).................................................................47

*All Care Nursing Serv. v. High Tech Staffing Servs., Inc.*,
    135 F.3d 740 (11th Cir. 1998) .....................................................................19, 27

*Almanza v. United Airlines, Inc.*,
    851 F.3d 1060 (11th Cir. 2017) ...................................................................30, 33

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &
    Pro. Publ'ns, Inc.*,
    108 F.3d 1147 (9th Cir. 1997) ...........................................................................39

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ...............................................................................32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................15

*Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*,
    68 F.3d 409 (11th Cir. 1995) .............................................................................54

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) .............................................................39, 42, 52

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................*passim*

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
    974 F.2d 1358 (3d Cir. 1992) ......................................................................36, 37

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
    203 F.3d 1028 (8th Cir. 2000) ...........................................................................34

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*,
  No. 8:17-CV-1584-T-23AEP, 2017 WL 4182405 (M.D. Fla. Sep.
  21, 2017) ...........................................................................................................18

*Bolinger v. First Multiple Listing Serv., Inc.*,
  838 F. Supp. 2d 1340 (N.D. Ga. 2012).......................................................13, 31

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979)...............................................................................................28

*Brown Shoe Co. v. United States*,
  370 U.S. 295 (1962)..............................................................................22, 23, 44

*Carmouche v. Tamborlee Mgmt.*,
  789 F.3d 1201 (11th Cir. 2015) .........................................................................15

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
  752 F.2d 609 (11th Cir. 1985) ...........................................................................28

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .........................................................................16

*City First Mortg. Corp. v. Barton*,
  988 So. 2d 82 (Fla. Dist. Ct. App. 2008)...........................................................53

*Crenshaw v. Lister*,
  556 F.3d 1283 (11th Cir. 2009) .........................................................................40

*Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*,
  No. 2:20-CV-838-JLB-NPM, 2021 WL 1578758 (M.D. Fla. Apr.
  22, 2021) ............................................................................................................54

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
  245 F. Supp. 3d 1343 (N.D. Ga. 2017), *aff'd sub nom. Siegel v.
  Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018)..................................32

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) .............................................................................29

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*In re Disposable Contact Lens Antitrust Litig.*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016)...........................................29

*Doe v. Thompson*,
  620 So. 2d 1004 (Fla. 1993) ...............................................17

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
  797 F.3d 1248 (11th Cir. 2015) ...........................................23

*Fed. Trade Comm'n v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016)....................................25

*Fed. Trade Comm'n v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015).........................................25

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986).................................................26, 27, 49

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
  500 F.3d 1276 (11th Cir. 2007) .............................................7

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969)............................................................41

*Gulf States Reorg. Grp., Inc. v. Nucor*,
  721 F.3d 1281 (11th Cir. 2013) ...........................................51

*Handicomp, Inc. v. U.S. Golf Ass'n*,
  No. 99-5372, 2000 WL 426245 (3d Cir. Mar. 22, 2000) ..................39

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ...............................................30

*Internet Sols. Corp. v. Marshall*,
  39 So. 3d 1201 (Fla. 2010) .................................................18

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) .................................*passim*

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Kitroser v. Hurt*,
    85 So. 3d 1084 (Fla. 2012) ................................................................18

*Lane v. XYZ Venture Partners, L.L.C.*,
    322 F. App'x 675 (11th Cir. 2009) ....................................................17

*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ..............................................19

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
    72 F.3d 1538 (11th Cir. 1996) ....................................................*passim*

*Louis Vuitton Malletier, S.A. v. Mosseri*,
    736 F.3d 1339 (11th Cir. 2013) .........................................................17

*M & H Tire Co. v. Hoosier Racing Tire Corp.*,
    733 F.2d 973 (1st Cir. 1984) .............................................................28

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) .........................................................20

*Mazda v. Carfax, Inc.*,
    No. 13-CV-2680 (AJN), 2016 WL 7231941 (S.D.N.Y. Dec. 9,
    2016), *aff'd*, 726 F. App'x 66 (2d Cir. 2018) ....................................39

*McWane, Inc. v. Fed. Trade Comm'n*,
    783 F.3d 814 (11th Cir. 2015) ....................................................26, 45

*Mfg. Rsch. Corp. v. Greenlee Tool Co.*,
    693 F.2d 1037 (11th Cir. 1982) .........................................................53

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) .............................................................36

*Moecker v. Honeywell Intern., Inc.*,
    144 F. Supp. 2d 1291 (M.D. Fla. 2001) .............................................52

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)..................................................................31

*Morris v. SSE, Inc.*,
  843 F.2d 489 (11th Cir. 1988) .............................................15

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .............................................29

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958).............................................................28, 41

*Nat'l Collegiate Ath. Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)................................................................26

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985).............................................28, 38, 43, 44

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)..............................................................28

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018).........................................................44, 48

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
  No. SACV 12-CV-02102-JST, 2013 WL 3936394 (C.D. Cal. July
  30, 2013) ..............................................................................46

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ............................................48

*PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*,
  598 F.3d 802 (11th Cir. 2010) .............................................15

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
  917 F.3d 1249 (11th Cir. 2019) ...............................15, 31, 36

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ...............................................................20

*Realcomp II, Ltd. v. Fed. Trade Comm'n*,
   635 F.3d 815 (6th Cir. 2011) ...............................................................49

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...............................................................22

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
   No. 5:19CV55-TKW-MJF, 2022 WL 19408080 (N.D. Fla. Feb. 7,
   2022) ...................................................................................................47

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
   105 F.3d 1376 (11th Cir. 1997) .....................................................27, 38

*Richards v. Sen*,
   No. 07-14254-CIV, 2008 WL 4889623 (S.D. Fla. Nov. 12, 2008)...................18

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
   390 F. Supp. 3d 1341 (M.D. Fla. 2019).............................................39

*In re Salmon*,
   No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128 (S.D.
   Fla. Mar. 23, 2021) .............................................................................34

*Seagood Trading Corp. v. Jerrico, Inc.*,
   924 F.2d 1555 (11th Cir. 1991) .........................................................28

*Silver v. New York Stock Exchange*,
   373 U.S. 341 (1963)............................................................................43

*Simpson v. Sanderson Farms, Inc.*,
   744 F.3d 702 (11th Cir. 2014) ...........................................................23

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) .......................................45, 48, 51, 53

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Spirit Airlines, Inc. v. Nw. Airlines*,
  431 F.3d 917 (6th Cir. 2005) ...............................................................26

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997)..................................................................................44

*Statton v. Fla. Fed. Jud. Nominating Comm'n*,
  959 F.3d 1061 (11th Cir. 2020) .........................................................18

*Swinford v. Santos*,
  121 F.4th 179 (11th Cir. 2024) ..........................................................15

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)..............................................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................7

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) .............................................................29

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
  7 F.3d 986 (11th Cir. 1993) ...............................................19, 39, 51

*United States v. Andreas*,
  216 F.3d 645 (7th Cir. 2000) .............................................................33

*United States v. Apple*,
  791 F.3d 290 (2d Cir. 2015) .........................................................37, 38

*United States v. Beaver*,
  515 F.3d 730 (7th Cir. 2008) .............................................................33

*United States v. Chandler*,
  388 F.3d 796 (11th Cir. 2004) .........................................................29

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)..............................................................................31

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 188 (3d Cir. 2005) ........................................................47, 49

*United States v. DuPont & Co.*,
  351 U.S. 377 (1955)..............................................................................20

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011)................................................25, 50

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..............................................................45

*United Wholesale Mortgage, LLC v. Am.'s Moneyline, Inc.*, No.
  22-10228, 2025 WL 502743 (E.D. Mich. Feb. 14, 2025) ...............21, 22, 23, 35

*Vacation Break U.S.A., Inc. v. Mktg. Response Grp. & Laser Co.*,
  169 F. Supp. 2d 1325 (M.D. Fla. 2001)..............................................28

*Virgin Atlantic Airways Ltd. v. British Airways Plc*,
  257 F.3d 256 (2d Cir. 2001) ...............................................................49

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*,
  648 F.3d 452 (6th Cir. 2011) ......................................................16, 36

*Wendt v. Horowitz*,
  822 So. 2d 1252 (Fla. 2002) ................................................................18

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ...................................................36, 37

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................46

**Statutes**

15 U.S.C. § 1 ............................................................................................4

§ 48.193, Fla. Stat. ................................................................................17

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

§ 501.201, Fla. Stat. ...........................................................................................4

§ 542.18, Fla. Stat. ............................................................................................4

§ 542.19, Fla. Stat. ............................................................................................4

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) .....................................................................................5

Fed. R. Civ. P. 12(b)(2) .....................................................................................5

Fed. R. Civ. P. 12(b)(6) ................................................................................5, 15

## **STATEMENT OF THE ISSUES**

1.     Whether the District Court correctly dismissed all claims of Plaintiff-Appellant The Okavage Group, LLC ("Plaintiff") against Defendant-Appellee Mathew Ishbia ("Mr. Ishbia") for lack of personal jurisdiction.

2.     Whether the District Court correctly dismissed Plaintiff's claims against Defendant-Appellee United Wholesale Mortgage, LLC ("UWM") for per se boycott or unreasonable restraint of trade under Section 1 of the Sherman Act because, among other deficiencies, Plaintiff failed to allege the relevant market, a horizontal conspiracy, UWM's market power, or detrimental effects to competition.

3.     Whether the District Court correctly dismissed Plaintiff's claims against UWM for attempted monopolization in violation of Section 2 of the Sherman Act because Plaintiff failed to allege a dangerous probability of achieving monopoly power or a specific intent to monopolize.

4.     Whether the District Court correctly dismissed Plaintiff's state law claims under the Florida Antitrust Act, the Florida Deceptive and Unfair Trade Practices Act, and for declaratory relief because they were derivative of Plaintiff's facially deficient antitrust claims.

## STATEMENT OF THE CASE

### I.    Introduction.

This appeal arises out of Plaintiff's unsuccessful efforts to force UWM to change the terms UWM offers to Plaintiff and other mortgage brokers in the highly-competitive residential mortgage lending market. UWM is a wholesale mortgage lender. (R:1:29). It is the largest wholesale mortgage lender in the country, but still just one of more than fifty. (R:1:3). Wholesale mortgage lending is one of two major channels (along with retail) competing to offer residential mortgage loans to homebuyers. (R:112:3). Plaintiff's grievances have their origins in UWM's decision to confront the conduct of two entities, Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway"), whose practices UWM felt jeopardized the pro-consumer, pro-small business wholesale mortgage lending channel. (R:1; R:32; R:69; R:96). Rocket and Fairway were originating loans through brokers in the wholesale channel and then converting those brokers' customers to the retail channel. (R:102:10). To address these practices, UWM announced its "All-In Initiative" on March 4, 2021, stating it had decided to end its relationship with brokers originating loans with Rocket or Fairway. (R:102:10).

Plaintiff opposed the All-In Initiative and rejected UWM's offered terms. (R:112:7). Plaintiff was, of course, free to say no, as was any other broker. Plaintiff and these other brokers were free to continue originating wholesale mortgages with

Rocket, Fairway, and any of 50+ wholesale mortgage lenders other than UWM. Many other brokers, unlike Plaintiff, responded enthusiastically to UWM's offered terms. (R:112:6). These brokers undertook no minimum commitment to submit loans to UWM, were free to originate loans with any of 50+ wholesale mortgage lenders other than Rocket and Fairway, and were free to change their minds and terminate their agreements with UWM at any time, without consequence, and thereafter to originate loans with Rocket and Fairway. Consumers remained free to choose from among hundreds of competing residential mortgage loan products in the retail and wholesale channels, and to choose any broker or lender they liked.

Despite the vast array of competitive choices remaining to Plaintiff, other mortgage brokers, and consumers, following the announcement of the All-In Initiative, Plaintiff has sought to force UWM—through a combination of publicity stunts and unsupportable legal claims—to do business with Plaintiff and other brokers still originating loans with Rocket or Fairway. (R:1; R:32; R:69; R:96). Plaintiff has commenced a putative class action asserting a series of deficient and implausible federal and state antitrust claims and derivative state law claims. (R:1; R:32; R:69; R:96). Plaintiff has also personally named Mr. Ishbia, UWM's chief executive officer, merely for announcing the All-In Initiative. (R:1; R:32; R:69; R:96).

The District Court and the Magistrate Judge gave Plaintiff four opportunities

to allege facts supporting some plausible theory against UWM or some basis to hale Mr. Ishbia personally into Florida court. (R:1; R:32; R:69; R:96). Plaintiff failed to do so. Accordingly, the District Court correctly dismissed Plaintiff's Supplemental Amended Complaint (the "Supplemental Complaint") in its entirety. (R:125). Among other deficiencies, the District Court found Plaintiff failed to allege its asserted submarket of wholesale residential mortgage lenders, a horizontal conspiracy or boycott, UWM's market power, barriers to entry, anything more than conclusory assertions of harm to competition, UWM's actual or threatened ability to assert monopoly power, or a specific intent to monopolize. (R:125). The District Court's ruling is well-grounded in settled law and should be affirmed.

## II.    Nature of the Case.

Plaintiff asserts putative class action claims against UWM and Mr. Ishbia (collectively, "Defendants") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, and the Florida Antitrust Act, §§ 542.18, 542.19, Florida Statutes, tortious interference, violation of Florida's Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes ("FDUTPA"), and declaratory relief. (R:96). This appeal follows the District Court's dismissal of Plaintiff's claims against Mr. Ishbia for lack of personal jurisdiction, and of Plaintiff's claims against UWM for failure to state a claim. (R:112; R:125).

### III. District Court Proceedings and Disposition.

Plaintiff filed its original Class Action Complaint on April 23, 2021. (R:1). Defendants moved to dismiss on June 18, 2021, for lack of standing under Rule 12(b)(1), failure to state a claim under Rule 12(b)(6), and lack of personal jurisdiction as to Mr. Ishbia under Rule 12(b)(2). (R:16). Plaintiff moved to amend and responded to Defendants' motion to dismiss on July 30, 2021. (R:27; R:28; R:29; R:30). The Magistrate Judge granted leave to amend on August 3, 2021. (R:31). Plaintiff filed its First Amended Class Action Complaint on August 3, 2021. (R:32). Defendants again moved to dismiss on September 7, 2021, presenting the same grounds for dismissal. (R:46). Plaintiff responded on October 28, 2021. (R:53). The District Court referred Defendants' motion to dismiss to the Magistrate Judge. (R:60).

The Magistrate Judge issued a 50-page Report and Recommendation on July 27, 2022, recommending denial of Defendants' standing arguments, but otherwise recommending Defendants' motion to dismiss be granted as to all counts, with leave to amend. (R:61 (the "2022 Report")).

Plaintiff filed an unopposed motion to amend on October 21, 2022, which the Magistrate Judge granted on November 8, 2022. (R:67; R:68). Plaintiff filed its Second Amended Class Action Complaint on November 8, 2022. (R:69). Defendants again moved to dismiss on December 14, 2022, reasserting their

arguments for failure to state a claim and lack of personal jurisdiction. (R:73). Following briefing, Plaintiff moved for leave to supplement its pleadings. (R:80; R:81). The Magistrate Judge granted leave to supplement over Defendants' objections on July 18, 2023. (R:84; R:93; R:94; R:95). Plaintiff filed the present Supplemental Complaint on July 19, 2023. (R:96).

Defendants moved to dismiss the Supplemental Complaint on August 14, 2023, again for failure to state a claim and lack of personal jurisdiction. (R:102). Following briefing (R:105; R:107; R:108), the Magistrate Judge issued a 48-page Report and Recommendation on February 6, 2024, recommending that Defendants' motion to dismiss be granted in its entirety and the Supplemental Complaint (described as the third amended complaint) be dismissed on all counts. (R:112 (the "2024 Report")).

Following objections (R:113; R:114; R:116; R:117), the District Court entered its dismissal order overruling Plaintiff's objections to the 2024 Report and granting Defendants' motion to dismiss Plaintiff's Supplemental Complaint in its entirety on September 23, 2024. (R:125). Plaintiff filed its Notice of Appeal on October 17, 2024. (R:129).[1]

---

[1] While the 2024 Report, objections, and response were still pending, Plaintiff again moved again to supplement its pleadings on June 6, 2024, which Defendants opposed. (R:118; R:119; R:120; R:123). The Magistrate Judge denied leave to supplement on September 18, 2024. (R:124). Plaintiff objected and Defendants responded. (R:127; R:128). Although the Second Supplemental Complaint is not the

## STATEMENT OF THE FACTS

**I.    Plaintiff Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway.**

Plaintiff is a mortgage broker who did business with UWM for less than a year pursuant to a Broker Agreement it signed on November 20, 2020.  (*See* R:96:6-7, 25-26; R:102:298-316).[2] Plaintiff also alleges a business relationship with Rocket and Fairway. (R:96:25-26). UWM is a wholesale residential mortgage lender, as are the wholesale divisions of Rocket and Fairway. (R:96:6, 8, 11, 12). Unlike UWM, Rocket and Fairway also have retail lending divisions with captive loan officers that deal directly with consumers and bypass independent mortgage brokers. (R:96:8, 12).  The relationship between Plaintiff and wholesale lenders like UWM is vertical: Plaintiff acts as an intermediary between the wholesale lender and the borrower. (R:96:8-9).

---

operative pleading and the denial of leave to supplement is not part of this appeal, Plaintiff has improperly cited to it in its opening brief. *See* Appellant's Brief ("Pl. Br.") at 6 n.2.

[2] In the 2024 Report adopted by the District Court, the Magistrate Judge considered the exhibits to Defendants' motion to dismiss on the grounds that it may consider documents central to the plaintiff's claim at the dismissal stage if their authenticity is undisputed. (R:112:33 n. 11 (collecting cases); *see also* R:125:10); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007). Defendants made this showing for each exhibit and Plaintiff does not contest their consideration. (*See* R:102:13 & n.1, 14-17, 19, 21 & n. 6).

II.    **UWM's Share of the Highly Competitive Residential Mortgage Lending Market.**

Plaintiff characterizes wholesale lending as a "separate submarket" of residential mortgage lending. (R:96:8-11). But wholesale and retail residential loans are interchangeable, as both fill the same "need" of homebuyers to "borrow money" and "to offer the home as security." (R:96:8). Rocket and Fairway supplied loans to their customers in both channels, and Plaintiff has described their products as a "close substitute" for UWM's products. (R:96:6, 12-14; R:79:34). Retail lenders compete directly with UWM for loan originations in the residential mortgage market; competition is "intense" and includes "[i]nstitutions offering to make residential mortgage loans, *regardless of the channel*," including "direct retail lenders who market directly to homeowners[.]" (R:102:58, 67-68, 296 (emphasis added)).

UWM had an 8% share of the overall residential mortgage lending market, and a 38% share of the wholesale channel as of 2022. (R:102:60, 269). Plaintiff's assertion of a 54% share in the wholesale channel mischaracterizes UWM's Q4 2022 earnings call, in which Mr. Ishbia said UWM had a 54% share "of the broker channel in the fourth quarter," which represented "about 11% of the overall mortgage market" for that single quarter. (*Compare* R:96:39-40 *with* R:102:253-54). The mortgage brokers working with UWM were associated with just 45,000 out of 386,000 (11.6%) federally registered loan officers in the United States, of whom

only about 33,000 (8.5%) submitted a loan to UWM during 2022. (R:102:59).

Plaintiff misquotes Mr. Ishbia when referring to UWM as "dominant" and "'dominat[ing]' the wholesale markets." Pl. Br. at 16; (R:96:39). What he said is that investing in "our people, the brokers and our business" is UWM's "competitive advantage," and helps it emerge "stronger and more dominant," and that he does not pay attention to stock prices because his "job is to dominate every day at UWM, take care of our team members, take care of our clients, take care of our shareholders." (R:102:254, 296-97).

Plaintiff also mischaracterizes Mr. Ishbia's statements in the Q4 2022 earnings call that UWM "control[s]" its margins as a purported admission that UWM is able to "dictate prices in the market." Pl. Br. at 12; (R:96:41). What Mr. Ishbia said, in response to concerns about UWM temporarily cutting its margins to 50 basis points in response to "extremely competitive" pricing, is that UWM viewed an "annualized margin" of "75 to 100 basis points" as "very, very competitive pricing" and affirmed UWM's desire to "control" its own margins within that range. (R:102:256-58).

## III. UWM Announced the All-In Initiative to Combat Practices It Believes Are Harmful to the Wholesale Lending Channel.

This lawsuit arises out of the March 4, 2021 announcement by Mr. Ishbia, in his capacity as President and CEO of UWM, that UWM was adopting an amendment to its Broker Agreement to require a representation and warranty that mortgage

9

brokers who submit loans to UWM will not also submit loans to Rocket or Fairway (the "Amendment"). (R:96:14-15). Some brokers were asked to sign an Addendum confirming their assent to the Amendment. (R:96:17, 21). UWM had the contractual right to amend the Broker Agreement, and a broker's submission of any mortgage loan application to UWM after the date of the Amendment constitutes acceptance. (R:102:313).

Mr. Ishbia stated one purpose of the initiative was, "[w]e don't need to fund Fairway. . . or Rocket. . . to try to put brokers out of business." (R:96:15). He explained UWM's view that Rocket and Fairway were "out there hurting the wholesale channel" by "soliciting loan officers," "talking negatively about brokers," "trying to cut the loan officers," and "solicit[ing] your past clients." (R:102:329-33). He emphasized that "[w]hatever they want to do they can do. . . [a]s long as they play by the rules," but "that's not my business model," which is "helping you win" and "[b]eing all in for brokers." (R:102:330). Mr. Ishbia said there would be "no hard feelings" and brokers could "close out your loans" and "[t]ake care of consumers[] [e]ven if you . . . decline[.]" (R:102:332). He noted there were "73 other lenders," and brokers would "have options" with or without the "two [lenders] that are . . . hurting the channel[.]" (R:102:333).

Plaintiff alleges Mr. Ishbia's announcement drew numerous public reactions from brokers, citing public comments such as "We are ALL IN," "unstoppable

10

together," "Let's go!" and descriptions of brokers as "family," and also describes instances of brokers responding to one another's questions or encouraging one another to sign the Addendum. (R:96:16-17, 19-20). Plaintiff alleges that other brokers expressed vigorous opposition. (R:96:17, 29-31). Plaintiff alleges a split of trade associations' views, with the Association of Independent Mortgage Experts ("AIME") issuing a letter supporting the initiative, and two other associations issuing statements of opposition. (R:96:18-19, 30). Although Plaintiff describes UWM's initiative as "coercion," it does not identify any broker "coerced" into signing the Addendum or agreeing to the Amendment. (R:96:24-25, 31-33).

## IV.   Plaintiff and Other Brokers Remain Free to Choose Their Wholesale Lenders.

Plaintiff alleges it and other brokers declined the Amendment and their Broker Agreements with UWM were terminated. (R:96:24, 26). Each broker had the same freedom as Plaintiff to accept or decline the Amendment, and each broker could continue to work with 50+ other wholesale lenders regardless of its decision. (R:96:24, 26; R:102:332-33). Any broker signing a Broker Agreement with UWM can terminate it "for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice[.]" (R:102:352-53). A notice of termination immediately releases the broker from its commitment not to submit loans to Rocket or Fairway, without waiting for the notice period to elapse. (R:102:347).

Plaintiff mischaracterizes and alters excerpts of a February 28, 2023 *Detroit*

11

*News* interview with Mr. Ishbia, referencing a "penalty" for "working with Rocket," and referring to UWM being "bigger than" Rocket since UWM "announced the [Ultimatum.]" Pl. Br. at 12; (R:96:39, 40 (changing the word "initiative" to "[Ultimatum]")). What Mr. Ishbia said was there was "*no penalty*" and "*no fine*" for working with Rocket, and that the only "penalty" is that UWM would not work with brokers that elected to work with Rocket. (R:102:295 (emphasis added)). He also said, "Brokers can stop working with UWM at any time *without penalty*." *Id.* (emphasis added).

## V.    Plaintiff's Allegations Regarding the Effects of the Amendment.

Plaintiff asserts in conclusory strokes that Defendants' actions purportedly caused a shift in origination of mortgages away from Rocket and Fairway, "caused consumers to pay higher prices and obtain lower quality mortgages," and resulted in higher costs of operation and reduced competition. (R:96:7, 26-29). Plaintiff alleges the so-called "boycott" was "highly successful," based on public statements from UWM estimating that 93% of brokers presented with the Addendum agreed to sign it, and 11,000 out of 12,000 of UWM's independent mortgage brokers participated. Pl. Br. at 11, 32; (R:96:23). But, as the Magistrate Judge found in the 2024 Report, Plaintiff "provides no underlying facts at all" to support the allegations of higher prices or costs, lower quality mortgages, or reduced competition, or "indicating the actual effects of this on the market as a whole[.]" (R:112:37-40; *see also* R:125:9).

## SUMMARY OF THE ARGUMENT

Choosing between wholesale lenders competing to supply residential mortgage loans to homebuyers is not anticompetitive; it is the essence of competition. UWM offered mortgage brokers a choice between itself, Rocket, and Fairway. And whichever choice they made, the brokers were also free to choose from among 50+ other wholesale mortgage lenders in addition to UWM, Rocket, or Fairway. That is more than fifty times as much choice as retail lenders offer to their captive loan officers, who are bound to originate loans exclusively with a single lender. The fact that Plaintiff had to subtract one lender, UWM, from its dozens of lending options when it rejected UWM's offer, and that other mortgage brokers had to subtract two lenders, Rocket and Fairway, from their dozens of lending options when they accepted UWM's offer, does not state a claim under federal or state law. Indeed, the ultimate customers—homebuyers—experienced no reduction in choice at all, as they could still choose any broker or lender they wished. The District Court thus correctly dismissed the Supplemental Complaint.

*First*, the District Court correctly held Plaintiff failed to meet its burden of establishing a *prima facie* case for personal jurisdiction over Mr. Ishbia. The corporate shield doctrine precludes application of Florida's long-arm statute, and the "intentional tort" exception does not apply because Mr. Ishbia is not alleged to have committed any tortious conduct in Florida.

13

*Second*, the District Court correctly found Plaintiff failed to plead its asserted relevant market, wholesale residential mortgage lending, because wholesale and retail loans are interchangeable, making the total residential mortgage lending market the correctly defined relevant market.

*Third*, the District Court correctly found Plaintiff failed to plead a per se antitrust violation under Section 1 of the Sherman Act because (1) it has not alleged a horizontal conspiracy; (2) it has not alleged market dominance; and (3) it has not alleged a "cut off" of essential suppliers.

*Fourth*, the District Court correctly found Plaintiff failed to plead a rule of reason antitrust violation under Section 1 of the Sherman Act because it failed to allege the potential for genuine adverse effects on competition or an actual detrimental effect on competition.

*Fifth*, the District Court correctly found Plaintiff failed to plead attempted monopolization under Section 2 of the Sherman Act because Plaintiff failed to allege a dangerous probability of achieving monopoly power or a specific intent to monopolize.

*Sixth*, the District Court correctly dismissed Plaintiff's derivative and duplicative Florida Antitrust Act, FDUTPA, and declaratory relief claims.

The Court should therefore affirm the District Court's dismissal order.

14

## <u>ARGUMENT</u>

## I.    Standard of Review.

The District Court dismissed all claims against Mr. Ishbia for lack of personal jurisdiction. (R:125). This Court "review[s] *de novo* the decision of a district court to dismiss a complaint for lack of personal jurisdiction." *Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1203 (11th Cir. 2015) (citation omitted). Plaintiff "bears the burden of establishing a prima facie case of jurisdiction" over a non-resident defendant. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010) (quoting *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)).

The District Court dismissed all claims as to UWM for failure to state a claim under Rule 12(b)(6). (R:125). That ruling is reviewed *de novo*. *Swinford v. Santos*, 121 F.4th 179, 186 (11th Cir. 2024). The Court may consider the Supplemental Complaint, its exhibits, materials incorporated by reference, and judicially noticeable materials. *Id.* at 186-87.

Plaintiff must state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "The plausibility standard 'calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).

This Court has made clear that in an antitrust conspiracy case, the complaint must "possess[] enough heft to show that the pleader is entitled to relief," which requires "more than labels and conclusions[.]" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 557). Plaintiff's own authority agrees that "[c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 457 (6th Cir. 2011) (citation omitted).

## II.    The District Court Correctly Dismissed All Claims Against Mr. Ishbia for Lack of Personal Jurisdiction.

The District Court correctly adopted the Magistrate Judge's recommendation to dismiss all of Plaintiff's claims against Mr. Ishbia for lack of personal jurisdiction. (R:125:2, 10; R:112:10-14). Plaintiff acknowledges that Mr. Ishbia is a Michigan resident, and fails to allege any personal connection between Mr. Ishbia and Florida outside of his role as chief executive officer of UWM. (*See* R:96:3-4, 14-20, 23, 39-41, 53-61). Even as to actions allegedly undertaken by Mr. Ishbia in his executive capacity, Plaintiff does not allege any conduct by Mr. Ishbia occurring in or directed to Florida, just that Mr. Ishbia's communications announcing the All-In Initiative

were "received by" mortgage brokers, "including" those located in Florida. (R:96:3-4, 16).

In determining whether Plaintiff has met its burden of establishing a prima facie case of personal jurisdiction, this Court considers whether: (1) personal jurisdiction exists under Florida's long-arm statute, § 48.193, Florida Statutes; and (2) whether the exercise of that jurisdiction "would violate the Due Process Clause of the Fourteenth Amendment[.]" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (additional citation omitted); (*see also* R:112: 11). Plaintiff fails both legs of this test.

Florida's corporate shield doctrine "prohibit[s] the exercise of jurisdiction under the Florida long-arm statute over corporate employees whose only conduct in Florida was in furtherance of a corporation's interests." *Lane v. XYZ Venture Partners, L.L.C.*, 322 F. App'x 675, 678 (11th Cir. 2009) (citing *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993)). Plaintiff does not dispute the Magistrate Judge's finding that Plaintiff's "conclusory statements" fail to allege any facts establishing any connection between Mr. Ishbia's conduct and Florida other than in furtherance of UWM's interests. (R:112:12-13). Thus, the corporate shield doctrine precludes application of Florida's long-arm statute.

Plaintiff attempts to overcome the corporate shield doctrine on the theory that it "does not protect a corporate officer who commits intentional torts," and asserts

17

that antitrust violations are intentional torts. Pl. Br. at 52. At the outset, as the Magistrate Judge found, Plaintiff has failed to allege even that UWM, much less Mr. Ishbia personally, committed any intentional torts. *See* Argument, Points III-IX *infra*; (*see also* R:112:13-14).

Additionally, Plaintiff has failed to allege a sufficient jurisdictional connection between Mr. Ishbia's alleged "tortious" actions and Florida to satisfy Florida's long-arm statute or due process.[3] The intentional tort exception does not apply to a "nonresident employee-defendant" like Mr. Ishbia, who "commits no [tortious] acts ***in Florida***[.]" *Kitroser v. Hurt*, 85 So. 3d 1084, 1089-90 (Fla. 2012) (emphasis added). Allowing personal jurisdiction to attach based on mere "internet posts accessible in Florida," as Plaintiff urged below, "would not comport with" the "more restrictive" requirements of due process. *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1207, 1213-15 (Fla. 2010) (finding personal jurisdiction based on internet posts "targeted" at Florida residents with "allegedly defamatory material about a Florida resident" (quoting *Wendt v. Horowitz*, 822 So. 2d 1252, 1257 (Fla. 2002); *Richards v. Sen*, No. 07-14254-CIV, 2008 WL 4889623, at *5 (S.D. Fla. Nov. 12, 2008))); *see also Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*, No.

---

[3] The District Court did not reach this additional ground for dismissal. (*See* R:125:10; R:112:14). This Court "may affirm the judgment below on any ground supported by the record[.]" *See Statton v. Fla. Fed. Jud. Nominating Comm'n*, 959 F.3d 1061, 1065 (11th Cir. 2020).

8:17-CV-1584-T-23AEP, 2017 WL 4182405, at *4 (M.D. Fla. Sep. 21, 2017) (exercise of personal jurisdiction based on Internet content "accessible" in Florida "up-ends the protection of due process"); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1229 n.16 (S.D. Fla. 2017) ("accessibility" of Internet content insufficient to satisfy due process).

Accordingly, this Court should affirm the dismissal of all claims against Mr. Ishbia for lack of personal jurisdiction.

## III. The District Court Correctly Dismissed Plaintiff's Antitrust Claims Because Plaintiff Failed to Plead the Relevant Market Is the "Wholesale Lending Market."

The District Court correctly found Plaintiff "failed to plead that the wholesale lending market—as opposed to the total [residential] lending market—was the relevant market," and properly adopted the Magistrate Judge's market analysis. (R:125:6; R:112:28-33). Plaintiff's failure to plead a separate wholesale lending market or submarket precludes all of Plaintiff's antitrust claims other than its per se theories (addressed in Argument, Point IV *infra*). *See All Care Nursing Serv. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 749 (11th Cir. 1998) (holding that "defining the relevant market" is a "threshold question" necessary for plaintiff to satisfy the rule of reason under § 1 of the Sherman Act); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (similar); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) (holding that "[d]efining the market"

19

is "a necessary step" and "an indispensable element in the consideration of any monopolization or attempt case" under section 2 of the Sherman Act).

Defining the relevant market entails identifying all "commodities reasonably interchangeable by consumers for the same purposes." *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1341-42 (11th Cir. 1987) (quoting *United States v. DuPont & Co.*, 351 U.S. 377, 395 (1955)). A court making a relevant market determination thus looks "to the uses to which the product is put by consumers in general." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1221 (11th Cir. 2002) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997)). The "crucial fact driving the determination of the relevant product market" is whether the products at issue "were fully interchangeable with substitutes" from other suppliers. *Id*. at 1222. The relevant market is "composed of products that have reasonable interchangeability." *Jacobs*, 626 F.3d at 1337 (quoting *Levine*, 72 F.3d at 1552).

Plaintiff has failed to plead a relevant market of wholesale residential mortgage lending distinct from total residential mortgage lending. Plaintiff seeks to differentiate wholesale lenders like UWM marketing through brokers from retail lenders marketing directly to consumers. Pl. Br. at 4-5, 23-28; (R:96:8-11). But Plaintiff's allegations do not address the interchangeability of wholesale and retail residential mortgage loans. To the contrary, the Supplemental Complaint

20

acknowledges that there is "no substitute for ***mortgage lending*** for most consumers," and what consumers "need" is "to borrow money" and "to offer the home as security." (R:96:8 (emphasis added)). Wholesale and retail mortgage loans both satisfy this need.

The differences alleged by Plaintiff largely turn on the identity of the person who deals with the consumer, collects the loan application and documentation, and advises the consumer of available interest rates and terms. (R:96:8-9). But as the Magistrate Judge and District Court found, these differences supply no plausible factual rationale differentiating between wholesale and retail lending mortgage products from the standpoint of consumers choosing between residential mortgage loans to buy a home. (R:112:30-32; R:125:6). Indeed, Plaintiff alleges that its own preferred residential loan suppliers, Rocket and Fairway, originated their loans in both the wholesale and retail channels, thereby illustrating the substitutability of the same lenders' wholesale and retail mortgage loan products. (R:96:6, 12-14). Plaintiff has described Rocket's and Fairway's products as a "close substitute" for UWM's products. (R:79:34).

A separate district court persuasively concluded earlier this month that "nearly identical" allegations and claims against UWM by a different mortgage broker also failed to allege the "relevant market" is the "wholesale mortgage market." *United Wholesale Mortgage, LLC v. Am.'s Moneyline, Inc.*, No. 22-10228, 2025 WL

21

502743, at *1, 3 (E.D. Mich. Feb. 14, 2025). That court agreed with the Magistrate Judge and District Court here that "wholesale mortgages and retail mortgages are reasonably interchangeable products or services in borrowers' minds, so together they comprise the relevant market of residential mortgage lending." *Id*. at *4.

Plaintiff asserts that interchangeability merely defines the "outer boundaries" of a relevant market and seeks to invoke the "practical indicia" outlined in *Brown Shoe Co. v. United States*, 370 U.S. 295, 325 (1962), to allege a relevant wholesale lending "submarket." Pl. Br. at 23-24. Plaintiff notes that the Supplemental Complaint includes "specific allegations that track the *Brown Shoe* criteria." *Id*. at 24 (citing R:96:9-11). But Plaintiff mischaracterizes the law and Plaintiff's conclusory allegations.

The *Brown Shoe* "practical indicia" do not supplant the test of reasonable interchangeability. As this Court has recognized, in applying the *Brown Shoe* criteria, "[a] court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because '*[i]f consumers view the products as substitutes, the products are part of the same market*.'" *Jacobs*, 626 F.3d at 1337-38 (emphasis added) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)). Where, as here, two products "are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one," they "are reasonably interchangeable

substitutes for each other and hence are part of the same market." *Id*. at 1337 n.13. Thus, a *Brown Shoe* submarket analysis "does not replace" the test of interchangeability, and "only after concluding that a relevant market is adequately pled does the [c]ourt consider the existence of a narrower submarket." *United Wholesale Mortgage*, 2025 WL 502743, at *6. Because Plaintiff's allegations fail to address the reasonable interchangeability of wholesale and retail mortgage loans, a *Brown Shoe* submarket analysis is superfluous.

Moreover, Plaintiff may not rest on "skimpy allegations" or a "conclusional statement" with "no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers" treat the alleged submarket of products differently from the general market. *Jacobs*, 626 F.3d at 1338; *see also Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1264 (11th Cir. 2015) (similar); *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 711 (11th Cir. 2014) (similar). Here, as the Magistrate Judge noted, although the Supplemental Complaint "did include words that track the language in *Brown Shoe*," its assertions are "conclusory and unsupported by facts[.]" (R:112:32). And as the District Court found, Plaintiff's allegations "relate to the relationship between the broker and client and the benefits to the broker," but do not plausibly indicate why consumers would not substitute retail and wholesale residential mortgage loans. (R:125:6). The fact that wholesale and retail mortgage loans are sold to the consumer

differently simply does not speak to the salient question of how consumers view and use the two products—identically, to purchase homes—and why a consumer seeking a residential mortgage loan would not substitute one product for the other based on changes in price or quality. (*See* R:96:10-11).

Plaintiff's insistence that consumers might wish to "obtain advice" from a broker does not address cross-elasticity of demand; a consumer can obtain advice on interest rates or terms from a broker or retail loan officer, or both, and still select either loan product. (R:96:10-11). And Plaintiff's recitation that a "typical borrower" using a mortgage broker will save $9,400 over the life of the loan cuts against Plaintiff's position. (R:96:11). As the Magistrate Judge found, this allegation speaks to "the cross-elasticity of demand and reasonable substitutability of these products," supporting the view "that they are part of the same market." (R:112:31).

Plaintiff's allegations here are on the same footing as those this Court rejected in *Jacobs*, where the plaintiff sought to define a separate submarket of "visco-elastic foam mattresses" distinct from the market of traditional mattresses based on allegations that visco-elastic mattresses are "more expensive" and have "unique attributes." 626 F.3d at 1338. The Court found these allegations "of little help" because they "do not indicate the degree to which consumers prefer" one type of mattress over another "because of these unique attributes and differences in price," or whether the different mattresses are "put to different uses," or any of the other

facts "crucial to understanding whether a separate market exists[.]" *Id*. A complaint "conspicuously lacking" in facts "plausibly suggesting the definition of the alleged submarket," and instead resting on "unsupported assertions" of a distinct submarket, should be dismissed. *Id*. at 1338-39.

Plaintiff's out-of-circuit district court authorities in the merger context also offer no assistance, as each involved detailed facts explaining how goods in the different submarkets were put to different uses by distinct customer groups and were not interchangeable. They do not rest on mere differences in "distribution channels" or asserted "price differences," as Plaintiff asserts. Pl. Br. at 24-26; *see United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 55 (D.D.C. 2011) (submarket of distinct tax preparation products provided "through an entirely different method, technology, and user experience" with a "price disparity" of six to eight times between the two product types); *Fed. Trade Comm'n v. Staples, Inc.*, 190 F. Supp. 3d 100, 118-21 (D.D.C. 2016) (submarket of large B-to-B contract customers for office supplies because they demand distinct prices, demonstrate high sensitivity to price changes, and require specialized vendors from other purchasers of consumable office supplies); *Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 27-33 (D.D.C. 2015) (separate submarket for broadline foodservice distribution based on product depth and diversity, distinct facilities and operations, delivery, customer service,

value-added services, and distinct customers and pricing).[4]

Plaintiff's attempt to fall back on the proposition that relevant market is a "question of fact" is similarly unavailing. Pl. Br. at 26-27. As this Court observed in *Jacobs*, it "cannot accept this argument," because it would "absolve" Plaintiff "of the responsibility under *Twombly* to plead facts 'plausibly suggesting' the relevant submarket's composition." 626 F.3d at 1338. Plaintiff cannot plead conclusions now and hope discovery will supply the requisite facts later.

Lastly, Plaintiff attempts to jettison "relevant market" from the inquiry altogether by asserting it is "not critical" if Plaintiff can supply "direct evidence of effects on consumers without proof of a relevant market." Pl. Br. at 27-28. That misstates the law. In *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), the Supreme Court merely reiterated that "the absence of proof of market power does not justify a ***naked restriction on price or output***," and thus an "elaborate market analysis" is not required in such cases. *Id*. at 460-61 (emphasis added; quoting *Nat'l Collegiate Ath. Ass'n v. Bd. of Regents of Univ. of Okla*., 468 U.S. 85, 109-110 (1984)). Here, Plaintiff has alleged no such "naked restriction."

---

[4] Plaintiff's other authorities are similarly inapposite. *See McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 828-29 (11th Cir. 2015) (submarket for domestically-manufactured fittings because laws and project specifications preclude substitution of imported fittings); *Spirit Airlines, Inc. v. Nw. Airlines*, 431 F.3d 917, 933-35 (6th Cir. 2005) (submarket for leisure travel based on separate fares, separate fare restrictions, and distinct customer groups with different price sensitivities).

Accordingly, the District Court properly dismissed Counts II-III, V-VI, XI-XII, and XIV-XV for failing to allege the relevant market.

## IV. The District Court Correctly Dismissed Plaintiff's Claims for a Per Se Illegal Group Boycott.

The District Court correctly found Plaintiff failed to allege a per se illegal group boycott claim under Section 1 of the Sherman Act, because: (1) Plaintiff did not plausibly allege a horizontal or hub-and-spoke conspiracy between UWM and its mortgage brokers; (2) Plaintiff did not plausibly allege UWM and the mortgage brokers wield market dominance; and (3) Plaintiff did not plausibly allege that UWM's actions cut off a necessary supplier. (R:125:2-9; *see also* R:112:17-35). Each of these rulings is correct and each independently supports affirmance of the District Court's dismissal of Counts I and X of the Supplemental Complaint.

### A. Plaintiff Failed to Plead a Horizontal Agreement or a Hub-and-Spoke Conspiracy Between UWM and Its Mortgage Brokers.

The District Court correctly found Plaintiff failed to allege a per se illegal horizontal conspiracy. The Supreme Court and the Eleventh Circuit have cautioned "against the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability." *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 458). "[E]asy labels do not always supply ready answers," and the Court should be wary of "pigeonhole[s]" to invoke the per se rule. *All Care Nursing Serv., Inc. v.*

27

*High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998) (citations omitted). A rule of per se illegality may be applied only to challenged conduct that "fits into a [per se] proscribed category without distortion[.]" *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 612-13 (11th Cir. 1985) (quoting *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 977 (1st Cir. 1984)). Courts should apply the per se label "infrequently and with caution." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991).

A per se claim requires Plaintiff to allege agreements that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal[.]" *Vacation Break U.S.A., Inc. v. Mktg. Response Grp. & Laser Co.*, 169 F. Supp. 2d 1325, 1335 (M.D. Fla. 2001) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985). The practice at issue must be "one that would always or almost always tend to restrict competition[.]" *Id.* at 289-90 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)). Thus, in the group boycott context, the per se rule is limited "to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 137 (1998) (rejecting application of per se rule to

28

"an agreement by a buyer to purchase goods or services from one supplier rather than another" because the "freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage").

The District Court found Plaintiff failed to allege a per se actionable group boycott because it alleged only vertical agreements "between UWM and many of its broker" and did not plausibly allege "that the brokers formed a horizontal agreement" with UWM at its hub. (R:125:2-3; *see also* R:112:20-23). That left a "rimless wheel," which "does not amount to a per se restraint of trade under section 1." (R:112:22-23 (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015)); *see also United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1296 (M.D. Fla. 2016). "[T]he critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Plaintiff establishes no such connection—just parallel statements and actions. (R:96:16-17, 19-20, 29-31).

Plaintiff offers three erroneous criticisms of the District Court's ruling, each of which fails to overcome dismissal.

**1.    Plaintiff's Allegations of Broker Support Do Not Plead a Horizontal Agreement.**

Plaintiff asserts that its allegations of brokers' expressions of enthusiasm and support for the All-In Initiative, together with Mr. Ishbia's statements that brokers were "aligned" and had "locked arms," plausibly alleged a "meeting of the minds" and a "conscious commitment to a common scheme." Pl. Br. at 28-31. But as the District Court found, these allegations do not support an inference of a preexisting horizontal agreement to join the All-In Initiative, and in fact Plaintiff "specifically alleges that numerous brokers made dissenting comments as well, but this lack of mutual assurance did not hinder several brokers from agreeing to the new terms with UWM." (R:125:3 (citing R:96:17, 29-31)). Thus, Plaintiff's allegations "only plausibly allege individual expressions of support and parallel conduct." (R:125:3).

Such individual parallel expressions of support are "as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017) (quoting *Twombly*, 550 U.S. at 554). There "are obvious reasons for each broker" already doing business with UWM or facing the threat of customer erosion to Rocket's or Fairway's retail lines to enter into such an agreement, "reasons that have nothing to do with preexisting agreements of any kind." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010). Widespread enthusiasm for, alignment around, and participation in a popular offer

30

does not indicate a conscious commitment to restrain trade. Plaintiff has alleged no facts demonstrating any "uniformity that would be unexpected or idiosyncratic" or "rule out the possibility" that the brokers "were acting independently" for their individual best interests. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1271-72 (11th Cir. 2019) (quoting *Twombly*, 550 U.S. at 553-54). "The [c]ourt cannot infer such an agreement from what is simply a unilateral business decision." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1361 (N.D. Ga. 2012).

Antitrust law "does not restrict the long recognized right of [a party] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). A party "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). An allegation that many brokers were "all in" or "fully committed" to UWM's proposal, and that Mr. Ishbia was gratified by their reaction, says nothing to undermine the brokers' independence or exercise of their individual discretion—much less evidence an "assurance of common action." Pl. Br. at 28-31. These statements are not the "smoking gun" Plaintiff imagines. *Id.* at 30-31. Online enthusiasm is not a horizontal agreement.

## 2.    Plaintiff Has Not Alleged an Invitation to Collude.

Plaintiff asserts that UWM's announcement was also an "invitation to collude." Pl. Br. at 31-32. But as Plaintiff's own authority acknowledges, "[t]he term 'invitation to collude' describes an improper communication from a firm ***to an actual or potential competitor*** that the firm is ready and willing to coordinate on price or output or other important terms of competition." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) (emphasis added; citation omitted), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018). UWM's announcement was not directed to a competitor, but to brokers in a vertical relationship with UWM. Moreover, a purported "invitation" is not evidence of an agreement where its contents do not "tend[] to exclude" independent action. *Id*. at 1372. And "'invitations to collude' in the context of antitrust conspiracy claims have almost universally been private communications, not public disclosures[.]" *Id*. at 1373. Here, UWM publicly announced a new term on which it would do business with brokers, which they were free to accept or reject. That announcement "cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react." *Id*. at 1374 (citation omitted).[5]

---

[5] Plaintiff's other cases are not "invitation to collude" cases. They all involve horizontal agreements among direct competitors to boycott or fix prices, and have no bearing here. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 168–

### 3.      Plaintiff Has Not Alleged Plus Factors.

Plaintiff asserts the District Court failed to address the Supplemental Complaint's "specific allegations" of "critical plus factors" inferring the existence of an agreement. Pl. Br. at 32-36. The District Court correctly adopted the Magistrate Judge's analysis finding that Plaintiff had failed to plausibly allege any plus factors. (R:125:3; *see also* R:112:24-25). Allegations of "parallel conduct or interdependence" are insufficient to plead an antitrust conspiracy absent allegations "tending to exclude the possibility of independent action." *Twombly*, 550 U.S. at 554. Plaintiff has "the burden to present allegations showing why it is more plausible" the alleged parallel conduct indicates entry into an illegal conspiracy rather than "independent economic self-interest." *Jacobs*, 626 F.3d at 1343. "Factual enhancements," or plus factors, are inadequate if they "are still just allegations of parallel conduct." *Almanza*, 851 F.3d at 1070 (quoting *Twombly*, 550 U.S. at 557). Allegations of "independent responses to common stimuli" or "mere interdependence unaided by an advance understanding among the parties" are not plus factors. *Twombly*, 550 U.S. at 556 n.4 (citation omitted).

None of the "three different plus factors" advanced in Plaintiff's brief have

---

70 (2d Cir. 2012) (direct horizontal conspiracy among magazine publishers to eliminate wholesalers); *United States v. Beaver*, 515 F.3d 730, 735 (7th Cir. 2008) (direct price-fixing conspiracy among ready-made concrete producers); *United States v. Andreas*, 216 F.3d 645, 679 (7th Cir. 2000) (direct global cartel among three lysine producers).

any tendency to exclude independent economic self-interest, nor do they support any inference of an advance understanding among brokers. Pl. Br. at 22. First, Plaintiff references the "high level of inter-broker communications identified in" the Supplemental Complaint. Pl. Br. at 44. No such communications are identified in the Supplemental Complaint, nor does Plaintiff cite any such allegation. *See id.* To the extent Plaintiff is referencing brokers' public expressions of enthusiasm such as "We are ALL IN" (R:96:16-17), that is not what Plaintiff's cases mean by "interfirm communications," which are communications among competitors about pricing, and far more explicit allegations of such interfirm communications have been held inadequate. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (finding a "high level of interfirm communications" regarding "price verification" was "far too ambiguous" to support an inference of conspiracy).

Second, Plaintiff points to statements by AIME "endors[ing]" the All-In Initiative. Pl. Br. at 33. But "endorsement" by a trade association is not a "plus factor." Only allegations demonstrating how membership in the trade association afforded "the opportunity to exchange commercially sensitive information at trade association meetings" may suffice. *In re Salmon*, No. 19-21551-CIV-ALTONAGA/Louis, 2021 WL 1109128, at *6 (S.D. Fla. Mar. 23, 2021) (trade association "created a database and analytical tools" allowing industry members to

34

share pricing data). Plaintiff has offered no such allegations; just a generic reference to AIME's "regular meetings" and a "Facebook discussion page," with no allegation that brokers used these so-called "vehicles" to communicate about the All-In Initiative. (R:96:18-19).

Third, Plaintiff asserts the Supplemental Complaint alleges "very specific facts" suggesting brokers acted against their individual self-interests. Pl. Br. at 34 (citing R:96:12-14). The District Court correctly found Plaintiff's allegations did not plausibly establish "actions against self-interest," as they reflected brokers choosing for themselves between the two options presented—doing business with UWM or doing business with Rocket and Fairway. (R:125:3-5 (citing R:96:28); *see also* R:112:24-25). As the Magistrate Judge found, Plaintiff's allegations do not plausibly allege that joining the All-In Initiative "was against the interest of the brokers who did so." (R:112:25). Nor does Plaintiff's individual refusal to join, or its reasons for so refusing (*see* R:96:12-14), indicate what was in the self-interest of other brokers who decided differently. As the Eastern District of Michigan found in rejecting this same "plus factor" argument, "shifting business to certain lenders over others can be a shared but independent reaction to [a] myriad [of] market considerations," and Plaintiff has failed to allege "a plausible connection between that alleged trend and the conclusion that brokers were acting against their economic interests." *United Wholesale Mortgage*, 2025 WL 502743, at *10.

35

As this Court has recognized, choosing to "follow the lead" of another industry participant "rather than adhering" to past industry practice does not indicate the brokers were acting "against their own self-interest." *Quality Auto*, 917 F.3d at 1269. At most, the Supplemental Complaint alleges that brokers followed UWM's lead when it offered new terms to the market—not that they acted collectively or against their individual self-interests in doing so. (*See* R:96:16-17, 24-25). Plaintiff's allegations do not tend to exclude independent conduct, as its own cases (which are not "plus factor" cases) recognize they must for Plaintiff to allege an unlawful "concerted refusal to deal" rather than lawful "independent refusals to deal." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015); *see also Watson*, 648 F.3d at 457 (conduct must "tend[] to exclude the possibility" of independent action); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1360, 1363 (3d Cir. 1992) (court should not draw "inferences of unlawful activity" from "defendant's freedom, so long as it acts independently, to refuse to deal").

Plaintiff also chides the Magistrate Judge for noting that Plaintiff's allegations were "inadequate to establish" action against self-interest. Pl. Br. at 34. That accurately expresses this Court's direction in evaluating this plus factor. Courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287,

1310 (11th Cir. 2003). "Thus, if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Id*. Here, the benign explanation that brokers independently responded to UWM's proposal in their individual self-interests is equally or more plausible than Plaintiff's collusive explanation, and thus Plaintiff has failed to allege this plus factor.

### 4. Plaintiff Has Not Established Any "Other Errors."

Plaintiff asserts two "other errors" by the District Court, both of which lack merit. Pl. Br. at 36-38. Plaintiff did not allege that Mr. Ishbia provided an "assurance" that all brokers would join the All-In Initiative, just that the brokers who did would sign an Addendum. (R:96:20). Indeed, as the District Court noted, multiple brokers and associations publicly dissented and did not join. (R:96:17, 29-31; R:125:3). These allegations demonstrate independent action, not collusion.

The District Court also properly distinguished *United States v. Apple*, 791 F.3d 290 (2d Cir. 2015). That case is not analogous, as it involved collusion among three publishers to fix prices in a highly concentrated market, in which the defendant "consciously played a key role." *Id*. at 316. As the District Court found, *Apple* "was in a vastly different procedural posture," as the publisher "spokes" in the alleged conspiracy had "already expressed an interest in coordinated efforts to raise prices" before the defendant acted, the defendant informed the publishers it "was seeking a

'critical mass,' and would not launch the program without such agreement," and there was "more than mere evidence of assistance and encouragement" but "concerted pressure to take collective action at the highest levels." (R:125:4 (citing *Apple*, 791 F.3d at 301-09)). No analogous facts are alleged here.

The District Court's decision does not "read[] like a (highly questionable) decision on the merits after trial," as Plaintiff disparagingly asserts (Pl. Br. at 37-38), but rather reflects a proper application of precedent requiring plausible factual allegations of an illegal horizontal conspiracy to prevent the haphazard expansion of per se liability. The Supplemental Complaint is long on labels and conclusions but short on facts establishing a horizontal agreement, and the District Court properly dismissed it for failure to plead a per se claim under Section 1.

## B.    Plaintiff Failed to Plead Market Power or Dominance.

The District Court correctly found Plaintiff failed to allege that UWM, or its broker channel, had sufficient market power or dominance in the relevant market to support a per se violation of Section 1. (R:125:7-8; *see also* R:112:32-34). To guard against unwarranted expansion of the "group boycott" label, courts limit its application to cases in which "the conspirators imposing the group boycott possess 'market power or exclusive access to an element essential to effective competition[.]'" *Retina Assocs.*, 105 F.3d at 1381 (quoting *Nw. Wholesale*, 472 U.S. at 296). The "principal judicial device for measuring actual or potential market

power remains market share[.]" *U.S. Anchor Mfg.*, 7 F.3d at 994.

Here, the allegations and exhibits to the Supplemental Complaint, and the documents incorporated therein, indicate that UWM had only an 11% share of the overall residential mortgage lending market, a 34% market share in the wholesale channel as of March 31, 2020, and a 38% market share of the wholesale channel for the year ending December 31, 2022. (R:112:33-34 (citing R:96:11, 41; R:102:14, 253-54, 269; R:105:39)). As discussed in Argument, Point III *supra*, the total residential mortgage lending market is the relevant market, and therefore the correct market share is 11%, as the Magistrate Judge found. (R:112). But even if the market share analysis were limited to the wholesale channel, UWM lacks a sufficient share to cut off effective competition. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (market share of 50% or less is "inadequate as a matter of law").[6]

Plaintiff does not dispute that if the relevant market is total residential mortgage lending, as the District Court found, Plaintiff has not alleged sufficient market power to support a Section 1 claim. *See* Pl. Br. at 38-41. On that basis alone,

---

[6] *See also Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[a] mere showing of substantial or even dominant market share alone cannot establish market power . . . ."); *Handicomp, Inc. v. U.S. Golf Ass'n*, No. 99-5372, 2000 WL 426245, at *3-4 (3d Cir. Mar. 22, 2000) (72% insufficient); *Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2016 WL 7231941, at *14-15 (S.D.N.Y. Dec. 9, 2016) (90% insufficient), *aff'd*, 726 F. App'x 66 (2d Cir. 2018); *RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019).

this Court should affirm dismissal.

As to the wholesale channel analysis, Plaintiff criticizes the District Court for failing to credit its allegation that UWM's "most recent market share figure" as of the filing of the Supplemental Complaint was 54%. Pl. Br. at 38. But, as both the Magistrate Judge and the District Court found, that assertion was based on a quarterly earnings call during which UWM did ***not*** report a 54% market share, but rather a 54% share "of the broker channel in the fourth quarter," representing "about 11% of the overall mortgage market" and, for the full year, an "8% share of the overall mortgage market" and a 38% share "of the wholesale channel." (R:125:7; R:112:33-34 (citing R:102:253-54, 269)). Plaintiff is thus mischaracterizing its own source materials to assert a facially invalid market share. That is not a finding that Plaintiff's evidence is "unpersuasive" or an "improper weighing of the evidence." Pl. Br at 38-39. It is a proper application of the long-settled principle that, in ruling on a motion to dismiss, if the allegations of the complaint conflict with a document incorporated therein, the document controls. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009).

Plaintiff also critiques the District Court for "completely fail[ing] to address" the dominance of the brokers, "which undisputedly is 55%[.]" Pl. Br. at 39. But Plaintiff is conflating the number of brokers joining the All-In Initiative with the market share they represent. Even crediting Plaintiff's strained extrapolation that

"93% of the brokers presented with the Addendum" who "agreed to join" somehow constitute "more than 55% of all wholesale brokers"—despite Plaintiff's failure to allege that UWM in fact presented all brokers with the Addendum—that does not indicate these brokers control a 55% share of the wholesale channel, much less of the total residential mortgage lending market. Rather, as just discussed, the ***market*** share attributable to the highest estimate of UWM's ***broker channel*** share is 11% of the overall market and 38% of the wholesale channel. (R:102:253-54, 269). Neither indicates dominance by UWM's brokers.

Plaintiff also claims it satisfied market dominance by alleging UWM's ability to exclude competition, citing tying cases. Pl. Br. at 39-40. The Supplemental Complaint contains no such allegation; it only alleges that more than 9,000 brokers agreed to join the All-In Initiative. (R:96:2, 42). Nothing in Plaintiff's allegations indicates UWM had the power to exclude other lenders or other brokers from the market. To the contrary, there were 50+ other lenders in the wholesale channel. (R:102:333). And brokers could terminate their agreement with UWM at any time. (R:102:352-53). Nothing in these allegations indicates "sufficient economic power to impose an appreciable restraint on free competition," as Plaintiff's tying cases require. *N. Pac. Ry. Co.*, 356 U.S. at 11; *see also Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503-04 (1969).

Plaintiff asserts it alleged "high barriers to entry" to support market

41

dominance, and falsely asserts that the Magistrate Judge "effectively imposed a requirement" to "anticipate, and address, every possible counterargument on barriers to entry[.]" Pl. Br. at 40-41. Not so. As the District Court recognized, there are "clear gaps" in the plausibility of Plaintiff's alleged barriers to entry. (R:125:8-9). Most notably, Rocket and Fairway were already retail mortgage lenders that entered the wholesale channel, and Plaintiff has failed to allege any barriers that would prevent similar retail competitors from entering the same channel. (R:112:34). Plaintiff has also failed to allege how many wholesale lenders remain in the wholesale channel. (R:112:34). Even crediting Plaintiff's allegation of 17 recent exits, (R:96:40-41), that still leaves more than 50 existing competitors. (R:102:333). And although Plaintiff asserts that barriers into wholesale lending are "irrelevant" and it is the brokers who "possessed a dominant market position," Pl. Br. at 41, Plaintiff has alleged *no* barriers preventing new brokers from entering the market, nor preventing borrowers from changing brokers or switching to the retail channel. Thus, a wholesale lender "charging supracompetitive prices will soon attract new competitors," indicating a market with "low barriers to entry[.]" *Bailey*, 284 F.3d at 1256.

Lastly, Plaintiff insists it has satisfied the "undemanding" standard for dominance under *Northwest Wholesale Stationers*. Pl. Br. at 41. That case does not articulate a dominance standard; it simply notes that in cases applying the per se

approach, "frequently the boycotting firms possessed a dominant position in the relevant market." 472 U.S. at 294. Here, Plaintiff has not alleged UWM's (or its brokers') dominant position in the relevant market of total residential mortgage lending, nor in the wholesale channel.

### C. Plaintiff Failed to Plead the All-In Initiative Cut Off Necessary Suppliers.

The District Court also correctly found Plaintiff failed to allege facts supporting application of the "cut off" principle. (R:125:6; *see also* R:112:26-27). Plaintiff has alleged nothing like the circumstances of *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), where defendant controlled and cut off access to a private wire connection that was the only means for traders to access available market information. *Id*. at 347-48; *see also Nw. Wholesale Stationers*, 472 U.S. at 294. UWM does not have any similar ability to "cut off" Rocket or Fairway from any supply, facility, or market necessary to their origination of residential mortgage loans. First, Rocket and Fairway can both originate loans through their retail channels. (R:96:12). Second, they can originate loans with any of the thousands of brokers or 341,000 federally registered mortgage loan officers that did not join the All-In Initiative. (R:102:69). Third, they can persuade any of the brokers currently working with UWM to terminate their relationship with UWM, as they are free to do at any time. (R:102:352-53). The fact that many brokers prefer UWM over Rocket and Fairway is not a "cut off"; it is competition. *See Levine*, 72 F.3d at 1551 ("The

43

antitrust laws are intended to protect competition, not competitors" (citing *Brown Shoe*, 370 U.S. at 344)).

For each of these three independent reasons, the District Court properly dismissed Counts I and X.

## V.   The District Court Correctly Dismissed Plaintiff's Rule of Reason Claims for Unreasonable Restraint of Trade.

Having failed to allege that the All-In Initiative falls within the circumscribed range of per se conduct "characteristically . . . likely  to result in predominantly anticompetitive effects," Plaintiff's claims for unreasonable restraint of trade under Section 1 of the Sherman Act must instead be evaluated under the rule of reason. *Nw. Wholesale Stationers*, 472 U.S. at 284, 296-97. The District Court correctly found Plaintiff failed to allege a rule of reason claim. (R:125:9-10; *see also* R:112:35-40). That ruling is correct and supports affirmance of the District Court's dismissal of Counts II and XI of the Supplemental Complaint.

The rule of reason requires a court to "decide whether the questioned practice imposes an unreasonable restraint on competition[.]" *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997). It entails a three-step, burden-shifting analysis, with Plaintiff having "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). To fulfill its burden, Plaintiff may either allege "the potential for genuine adverse effects on competition" or "an actual

detrimental effect on competition." *Levine*, 72 F.3d at 1551 (citations and additional quotations omitted). Plaintiff failed to allege either condition here.

### A.    Plaintiff Failed to Plead the Potential for a Genuine Adverse Effect on Competition.

To plead the potential for a genuine adverse effect on competition, Plaintiff must allege that UWM exercises market power in a properly defined market. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004). It must further allege that UWM's actions substantially foreclosed competition in that market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). As already discussed, Plaintiff has not sufficiently alleged the relevant market, or that UWM held market power in the relevant market. *See* Argument, Points III, IV.B *supra*. On that basis alone, this Court should affirm the District Court's ruling.

Plaintiff also has not alleged that the Amendment has foreclosed competition even in the wholesale channel. "Substantial foreclosure" is "a requirement for exclusive dealing to run afoul of the antitrust statutes." *McWane, Inc.*, 783 F.3d at 837. Foreclosure occurs when "the opportunities for other traders to enter or remain" are "significantly limited" by the exclusive dealing arrangement. *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (en banc) (internal citation omitted)). As already discussed, Plaintiff has failed to allege that the All-In Initiative significantly limited the ability of other lenders or brokers to enter or

45

remain in the market. *See* Argument, Points III, IV.B-C *supra*. Thus, Plaintiff has not alleged foreclosure.

Plaintiff asserts the imposition of "burdensome terms on intermediaries" can be indicative of market power. Pl. Br. at 46-48. But Plaintiff alleges no imposition of "burdensome terms" on either intermediaries or consumers—nor would such an allegation be plausible since mortgage brokers could terminate at will and immediately work with Rocket and Fairway, and consumers could pick any lender or broker they like. (*See* R:102:352-53). The allegations Plaintiff cites merely allege that Mr. Ishbia spoke positively about brokers' selection of UWM over Rocket and Fairway and UWM now being "bigger than them." Pl. Br. at 46-48 (citing R.96:21-22). That is not "direct evidence of market power" from Mr. Ishbia, as Plaintiff asserts, much less evidence of "burdensome terms." Pl. Br. at 48. It simply indicates UWM is outpacing Rocket in signing brokers in a wholesale channel with more than 50 other options and where brokers remain free to switch. *See* Argument, Point IV.B *supra*.

Competition is not foreclosed where, as here, the exclusivity term is "of relatively short duration and, crucially, can be terminated upon short notice." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-CV-02102-JST (ANx), 2013 WL 3936394, at *4 (C.D. Cal. July 30, 2013). Such terms "generally pose little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir.

2012). They are nothing like the burdensome terms in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 188 (3d Cir. 2005), where a supplier of artificial teeth with a 75%-80% market share imposed a long-term "all-or-nothing" exclusivity criterion on dealers prohibiting them from adding any competitor's teeth to their product offerings. *Id*. at 184-85, 196.

Plaintiff also references "Mr. Ishbia's remarks that UWM controls industry margins" as an indicator of market power. Pl. Br. at 48. That again mischaracterizes Mr. Ishbia's remarks from a quarterly earnings call, where Mr. Ishbia explained why UWM had temporarily cut its margins to 50 basis points in response to "extremely competitive" pricing and affirmed UWM's desire to "control" its margins to an "annualized margin" of 75 to 100 basis points in the face of "very, very competitive pricing." (R:102:256-58). Being forced to cut margins in response to "extremely competitive" pricing does not indicate market power under the Lerner Index, which is designed to "analyze[] the probability that given prices are supracompetitive using price and marginal costs." *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2022 WL 19408080, at *7 (N.D. Fla. Feb. 7, 2022) (quoting *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016)). Plaintiff has not plausibly alleged UWM's market power.

### B. Plaintiff Failed to Plead an Actual Detrimental Effect on Competition.

The hallmarks of an actual detrimental effect on competition are "reduced

output, increased prices, or decreased quality," as Plaintiff acknowledges. Pl. Br. at 43 (quoting *Am. Express*, 585 U.S. at 542). The Supplemental Complaint contains no such allegations, and the allegations cited by Plaintiff do not show otherwise. Pl. Br. at 43. Plaintiff's allegations compare the mortgage products offered by UWM, Rocket, and Fairway, assert the superiority of the Rocket and Fairway products, and make conclusory assertions of increased costs of mortgage loans and operations and "reducing the[] access" of consumers to allegedly lower-priced and higher-quality products. (R:96:12-14, 26-29).

Plaintiff's allegations do not plausibly allege a detrimental effect. "[A] plaintiff may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions" and must "point to specific facts demonstrating harm to competition." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016). The allegations must demonstrate "damage to competition itself" rather than to a competitor. *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1072. Plaintiff has not plausibly alleged harm to competition, because it has not alleged facts demonstrating that consumers actually experienced any reduced access to any residential mortgage loan products; they could still choose any broker, wholesale lender, or retail lender they wished. And each mortgage broker, whether they signed the Addendum or not, still had access to 50+ other wholesale lenders. And each mortgage broker signing the Addendum could terminate at any time. Thus, as the Magistrate Judge found,

48

Plaintiff "provides no underlying facts at all . . . to support its conclusion that the ultimatum has increased the costs of mortgage loans," nor any facts "indicating the actual effects of this on the market as a whole . . . particularly considering that consumers were free to access those mortgages from the brokers who did not work with UWM or sign the agreement." (R:112:37-40; *see also* R:125:9).

Plaintiff's cases miss the mark. Indeed, their lead case, *Virgin Atlantic Airways Ltd. v. British Airways Plc*, 257 F.3d 256 (2d Cir. 2001), supports the District Court's dismissal ruling. There, the Second Circuit affirmed the District Court's ruling that plaintiff failed to demonstrate an actual adverse effect because "hypothetical assumptions cannot substitute for actual market data" and plaintiff failed to show "harm to consumers" from the at-issue incentive agreements. *Id*. at 264-65. The same is true here; Plaintiff's allegations are based on assumptions, not market data, and show no harm to consumers. Plaintiff's other cases are facially inapposite because all involved actual, demonstrable detrimental effects and not mere conclusions. *See Ind. Fed'n of Dentists*, 476 U.S. at 459 (discussing how horizontal agreement among dentists to withhold x-rays from insurance companies directly increased costs to insurers and patients to obtain x-rays); *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815, 832-33 (6th Cir. 2011) (discussing actual market data reflecting how website policy reduced share of discount real estate listings in the relevant market); *Dentsply Int'l*, 399 F.3d at 191-93 (finding that long-

term "all-or-nothing" exclusivity criterion preserved monopoly and precluded "any rival," while distinguishing cases like this one where brokers can offer "the products of multiple vendors"); *H&R Block*, 833 F. Supp. 2d at 80 (discussing the actual harm from eliminating by merger a competitor that "play[s] a special role in this market that constrains prices").

Plaintiff also tries to set up a straw man argument, falsely asserting the Magistrate Judge held an antitrust violation "could not exist" unless Rocket and Fairway were "completely expelled from the market." Pl. Br. at 45. The Magistrate Judge made no such holding. She simply found Plaintiff's own allegation of the "elimination" of Rocket and Fairway from the market was "speculative at best" and fell short of "adequately pleading" a detrimental effect where Plaintiff alleged no facts indicating that they "were ever eliminated" or "no [could] longer participate" in the market. (R:112:8, 38 (citing R:96:26-27)). Identifying a deficiency in Plaintiff's allegation of market "elimination" is not the same as holding that an antitrust violation "could not exist" absent "complete expulsion" from the market. It simply reinforces the point that Plaintiff's assertion of an actual detrimental effect turns on conclusory and speculative assertions, not allegations of plausible fact.

Accordingly, the District Court properly dismissed Counts II and XI.

## VI. The District Court Correctly Dismissed Plaintiff's Attempted Monopolization Claim.

The District Court rightly concluded Plaintiff failed to allege an attempted

monopolization claim, because Plaintiff failed to plausibly allege a dangerous probability of achieving monopoly power or a specific intent to monopolize. (R:125:9-10; *see also* R:112:40-43). The failure of each of these "distinct elements" of an attempted monopolization claim supports the District Court's dismissal of Counts III and XII of the Supplemental Complaint. *Spanish Broad. Sys.*, 376 F.3d at 1074.

As discussed in Argument, Points III and IV.B *supra*, UWM had at most an 11% share of the relevant market, overall residential mortgage lending, and only 38% of the wholesaler channel if it were considered separately. A "dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorg. Grp., Inc. v. Nucor*, 721 F.3d 1281, 1285 (11th Cir. 2013) (citing *Levine*, 72 F.3d at 1555). Neither an 11% nor a 38% market share plausibly indicates a dangerous probability. *See U.S. Anchor Mfg.*, 7 F.3d at 1001 (holding that market share of "less than 50 percent" indicated "no dangerous probability of success").

Plaintiff's only response is to rehash its mischaracterization of a quarterly share of the broker channel as "market share," and to assert that an increase from 34% to 54% demonstrates a "consolidation trend" and "an inference of dangerous probability." Pl. Br. at 49. Putting aside that the wholesale channel is not the relevant market, *see* Argument, Point III *supra*, the actual apples-to-apples change in UWM's

share of the wholesaler channel was from 34% to 38%. *See* Argument, Point IV.B *supra*; (R:96:11, 41; R:102:14, 253-54, 269; R:105:39). That is "inadequate as a matter of law" to support a dangerous probability of monopoly power. *Bailey*, 284 F.3d at 1250. The same, of course, holds true for UWM's 11% share of the relevant residential mortgage market. The absence of significant barriers to entry, *see* Argument, Point IV.B *supra*, further reinforces the absence of such a dangerous probability. *See Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (citations and quotations omitted) (stating that even "high market share" will not raise an inference of monopoly power "in a market with low entry barriers").

Plaintiff's attempted monopolization claim also fails on the element of specific intent, which the Supplemental Complaint does not allege outside of a boilerplate recitation. (R:96). Plaintiff belatedly attempts to infer specific intent out of a series of unrelated allegations regarding Mr. Ishbia's purported aim of driving Rocket and Fairway from the wholesale channel. Pl. Br. at 50-51. But even if the Court were to assume that was UWM's aim, the relevant market is all residential mortgage lending, and Plaintiff does not and cannot allege any specific intent to drive Rocket, Fairway, or anyone else out of the retail channel or the residential mortgage lending market. Nor does Plaintiff dispute that it and every other broker remained free to submit loans to 50+ other lenders in addition to Rocket and

Fairway, and every broker who contracted with UWM could terminate at will. Nor, as already discussed, does Plaintiff allege any harm to competition. *See* § V.B *supra*. UWM's purported intent to out-compete Rocket and Fairway does not indicate a specific intent to monopolize. One competitor passing another in market share, even by "unfair means," does not indicate monopolization. *Spanish Broad. Sys.*, 376 F.3d at 1076 (citing *Mfg. Rsch. Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir. 1982)).

Accordingly, the District Court properly dismissed Counts III and XII.

## VII.  The District Court Correctly Dismissed Plaintiff's Derivative State Law Claims.

Plaintiff did not challenge the Magistrate Judge's recommendation to dismiss its tortious interference count (Count VII) and does not challenge its dismissal here. (R:125:2; R:112:43-47; R:116:1). Plaintiff's remaining state-law claims under the Florida Antitrust Act (Counts IV-VI, XIII-XV), FDUTPA (Count VIII), and for declaratory relief (Count IX), are derivative of the federal antitrust claims and were properly dismissed for the same reasons. (R:125:10; R:112:9 n.5, 35, 47-48 (collecting cases). Plaintiff does not dispute its state law claims cannot survive if the dismissal of its federal antitrust claims is affirmed. Pl. Br. at 51. Plaintiff's FDUTPA claim also fails because it has not alleged actual damages, a deceptive act or unfair practice, or causation. *See City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008). And Plaintiff's declaratory relief claim should also be

dismissed as duplicative, *see Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*, No. 2:20-CV-838-JLB-NPM, 2021 WL 1578758, at *2 (M.D. Fla. Apr. 22, 2021), and non-justiciable, *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995).

Accordingly, the District Court properly dismissed Counts IV-VI, VIII-IX, and XIII-XV.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court affirm the District Court's dismissal of Plaintiff's Supplemental Complaint and grant Defendants any other relief it deems necessary.

Dated: February 26, 2025        Respectfully submitted,

**GREENBERG TRAURIG, LLP**
77 West Wacker Dr.
Suite 3100
Chicago, Illinois 60601
Telephone: 312-656-8400
Telefax: 312-656-8401

By:    /s/ *Gregory E. Ostfeld*
        **Gregory E. Ostfeld**
        Illinois Bar No. 6257163
        Email: OstfeldG@gtlaw.com

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Telefax: 954-765-1477

By:    /s/ *Glenn E. Goldstein*
        **Glenn E. Goldstein, Esquire**
        Florida Bar No. 435260
        Email: GoldsteinG@gtlaw.com
            geistc@gtlaw.com
            FLService@gtlaw.com
        **Sabrina D. Niewialkouski**
        Florida Bar No. 123630
        Email: niewialkouskis@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue
Suite 4400
Miami, Florida 33131
Telephone: 305-579-0752
Telefax: 305-579-0717

By:    /s/ *Brigid F. Cech Samole*
        **Brigid F. Cech Samole**
        Florida Bar No. 730440
        Email: brigid.cechsamole@gtlaw.com

*Attorneys for Appellees-Defendants United*
*Wholesale Mortgage, LLC and Mathew Ishbia*

## <u>CERTIFICATE OF COMPLIANCE</u>

**Type-Volume.** This document complies with the word limit of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because, excluding parts of the document exempted by the Rules, this document contains 12,614 words.

**Typeface and Type-Style.** This document complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure.

Respectfully submitted,

By: /s/ *Gregory E. Ostfeld*

56

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed and has been furnished to the individuals listed below by e-mail generated by the CM/ECF system this 26th day of February, 2025:

Respectfully submitted,

By:    <u>/s/ *Gregory E. Ostfeld*</u>